ELLEN MEDLIN RICHMOND
(CA Bar No. 277266)
DEFENDERS OF WILDLIFE
600 17th Street
Suite 450N
Denver, CO 80202
Telephone: 720-943-4284
Email: erichmond@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*

UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>                    Plaintiff,<br><br>    vs.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br><br>                    Defendant. | Case No. 2:25-at-19<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This lawsuit challenges the decision of the U.S. Fish and Wildlife Service (the "Service") not to designate critical habitat for the Sierra Nevada distinct population segment ("Sierra DPS") of the Sierra Nevada Red Fox (the "Fox"), as required by the Endangered Species Act ("ESA"). *See* 86 Fed. Reg. 41,743 (Aug. 3, 2021) ("Listing Rule"). The Sierra DPS is critically endangered, with a population potentially as low as eighteen to thirty-nine individuals. This imperiled population needs all the help it can get. Yet the Service's unlawful decision, made at the time it listed the Sierra DPS as endangered in 2021, deprived this critically imperiled population of important habitat protections.

2.      The Service's decision not to designate critical habitat is unlawful for multiple reasons. First, the decision was based on the Service's unlawful ESA regulation at 50 C.F.R. §

1    424.12(a)(1)(ii), which lays out the circumstances under which the Service may decline to

2    designate critical habitat (even though designation is generally required to accompany all ESA

3    listings) because designation is "not prudent." As of amendments made to the regulation in 2019

4    and 2024, that regulation provides that "[d]esignation of critical habitat may not be prudent"

5    where "present or threatened destruction, modification, or curtailment of a species' habitat or

6    range is not a threat to the species." 50 C.F.R. § 424.12(a)(1)(ii) (the "Not Prudent Regulation").

7           3.     The Not Prudent Regulation contradicts the ESA. As set forth in detail below, the

8    ESA reflects Congress's intent to require critical habitat designation to accompany virtually all

9    listings, with exceptions only where designation would not provide a benefit to the species. The

10    Not Prudent Regulation reflects the precise opposite approach, allowing the Service to decline to

11    designate critical habitat—even if it would provide a benefit to the species—simply because

12    addressing other threats would benefit the species even more. Here, the Service relied on and

13    applied the Not Prudent Regulation in its decision listing the Sierra DPS as endangered under the

14    ESA. *See* 86 Fed. Reg. 41,743 (Aug. 3, 2021) ("Listing Rule"). Both the Not Prudent Regulation

15    and the application of the Not Prudent Regulation in the Listing Rule are unlawful.

16           4.     Further, even if the Not Prudent Regulation were lawful, the Service's decision not

17    to designate critical habitat for the Fox is still arbitrary and capricious and not in accordance with

18    law under the Administrative Procedure Act ("APA"). The record demonstrates that, contrary to

19    the Service's finding, the destruction, modification, or curtailment of a species' habitat or range *is*

20    a threat to the Sierra DPS, which faces threat of habitat degradation from snowmobiling, grazing,

21    and other uses.

22           **<u>JURISDICTION AND VENUE</u>**

23           5.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this

24    case presents a federal question under the laws of the United States, including the ESA and APA.

25    An actual, justiciable controversy exists between the parties. U.S. Const., Art. III. The requested

26    relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1540(g).

27    The APA and the ESA waive the Service's sovereign immunity. 5 U.S.C. § 702; 16 U.S.C. §

28    1540(g).

2               Complaint

6.      Venue in this Court is proper under 28 U.S.C. § 1391(e)(1). This action is brought against the Service, an agency of the United States. A substantial part of the events or omissions giving rise to the claim occurred in this district, and/or a substantial part of property that is the subject of the action is situated in this district, because the range of the Sierra DPS of the Fox is located in the district.

7.      Pursuant to Local Rule 120(d), this action is filed in the Court's Sacramento Division because the action arises in the counties covered by that Division. Specifically, the range of the Sierra DPS of the Fox includes portions of Alpine, Amador, Calaveras, El Dorado, Mono, Nevada, Placer, and Sierra Counties. In addition, the Listing Rule lists the Service's Field Supervisor for the Service's Sacramento field office as the principal point of contact, and identifies the staff members of that office among the principal authors of the rule. Listing Rule at 41,743, 41,757.

8.      This action is brought after providing sixty days' notice of Defenders' intent to sue, pursuant to 16 U.S.C. 1540(g)(2). The notice letter (with attachments) was sent on October 23, 2024 by email and certified mail. The U.S. Fish and Wildlife Service acknowledged receipt in a letter dated December 17, 2024.

## **PARTIES**

### **Plaintiff**

9.      Plaintiff Defenders of Wildlife ("Defenders") is a nonprofit 501(c)(3) membership organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats on which these species depend. Defenders is headquartered in Washington, DC and has over 276,000 members across the United States, of which nearly 34,000 reside in California. Defenders' California Program represents its members and staff in California and works on issues unique to the state.

10.     Defenders brings this action on behalf of itself and its members. Defenders' members appreciate the Sierra DPS of the Fox and also appreciate other species negatively impacted by the Not Prudent regulation, such as the whitebark pine. Defenders' members have

1   scientific, aesthetic, recreational, conservation, economic, educational, spiritual, and other

2   interests in these species; have recreated in the habitat of these species to enjoy the species. This

3   recreation includes hiking, wildlife viewing, photography, and other activities. Defenders'

4   members' interests and their enjoyment of these activities will be diminished if the Sierra DPS

5   and its habitat is not protected or if the Sierra DPS declines. Defenders' members have concrete

6   plans to continue pursuing the above activities, which are dependent on the continued existence of

7   a healthy ecosystem supporting native wildlife populations in the wild.

8        11.    For example, Pam Flick is a Defenders member and staffer who resides in

9   Orangevale, California and works as Defenders' California Program Director. This member is

10  familiar with Defenders' work to advocate for strong ESA implementation and to comment on all

11  major ESA regulatory changes, including the changes proposed in 2018 and finalized in 2019 and

12  the changes proposed in 2023 and finalized in 2024, which led to the current Not Prudent

13  Regulation. Through her work, this member is aware that the Service has inappropriately invoked

14  the Not Prudent Regulation for multiple species that she has a personal interest in, including the

15  Sierra DPS of the Fox and the whitebark pine. A native of the Sierra Nevada, this member

16  regularly returns to Fox habitat for work and also to recreate, enjoying activities like wildlife

17  watching, plant and wildlife species identification, outdoor photography, and hiking. For

18  example, during her youth the member took family camping and fishing trips to the High Sierra

19  near known observations of the Sierra DPS of the Fox, including to Tuolumne Meadows in

20  Yosemite National Park and Twin Lakes near Bridgeport. During her professional career, the

21  member worked to expand the boundaries of Hoover Wilderness, which is part of Sierra DPS

22  habitat. The Hoover Wilderness now has a special place in her heart and she has taken

23  backpacking trips to the area since doing this work, with plans to return in summer 2025. The

24  member also took a trip to Sonora Pass in October 2024 to hike, take photographs, and enjoy the

25  habitat of the Fox, meanwhile looking for the Fox or signs of it. On that trip she saw several

26  beautiful whitebark pine trees and enjoyed being in an area that is vibrant enough to support a

27  rare carnivore like the Fox—as she does on all such trips. She plans to make a similar trip to Fox

28  habitat in fall 2025, when there will be fall foliage and potentially snow that could reveal Fox

4                                                                          Complaint

tracks. This member's interests in and enjoyment of future visits to Fox habitat will be diminished absent full protections for the Sierra DPS and its habitat, and/or in the event that the Sierra DPS (or its habitat) declines.

12.     John Buckley is another Defenders member who resides in Twain Harte, California located at the edge of the Stanislaus National Forest and only sixty to seventy miles from one of the most active areas for the Sierra DPS. This member regularly spends time in the range of the Sierra DPS for personal outdoor recreation and for his professional work at a non-profit that works to address environmental threats in the central region of the Sierra Nevada. He has had the fortunate experience of sighting an individual of the rare Sierra DPS and continues to look for Foxes, as well as evidence of Fox occupancy such as scat and tracks, while in the area. As a part of his professional work, this member has directed wildlife camera surveys in Fox habitat and has successfully captured photographic evidence of Foxes in the Sierra DPS on three separate occasions. This member plans to return to visit the Sonora Pass area to enjoy Fox habitat and to look for signs of Foxes in the area at the first available opportunity when the mountain highways reopen in Spring 2025. This member's interests in and enjoyment of these future visits will be diminished absent full protections for the Sierra DPS and its habitat, and/or in the event that the Sierra DPS (or its habitat) declines.

13.     Megan Fiske is another Defenders member with a strong interest in protections for the Sierra DPS of the Fox and its habitat. A resident of Sonora, CA, this member is a biologist, teacher, and activist who previously worked conducting trail camera surveys for the Fox on the Stanislaus National Forest and within Yosemite National Park. She also received training on finding and collecting Fox scat from a UC Davis Fox researcher. Through her work on camera surveys she has walked the vast majority of known and potential Fox habitat on the Stanislaus National Forest. In addition to this work, she has spent considerable time in Fox habitat for recreation, as she loves to snowboard, hike, climb, snowshoe, photograph wildlife and landscapes, and just spend time in nature appreciating the beautiful plants, trees, and wildlife of the Sierra. She often recreates around Sonora Peak and the Leavitt Lake area, which is Fox habitat, and also likes to hike on a group of peaks in the area of Highway 4 near where Fox have

been captured on camera. When she visits these areas, she knows how to recognize signs of the Fox and always looks for them and enjoys knowing she is in an environment that supports them. But she is concerned about whether snowmobile usage and grazing in their habitat is being adequately managed. She believes critical habitat designation could benefit the Fox at a time when it is vulnerable. She has future trips planned to Fox habitat for recreation, including a tour to Lookout Peak (winter 2025) and a trip to Fox habitat near Blue Canyon Lake (summer 2025). She will take her camera and try to capture a photo of this rare animal. This member's interests in and enjoyment of these future visits will be diminished absent full protections for the Sierra DPS and its habitat, and/or in the event that the Sierra DPS (or its habitat) declines.

14.     Defenders' and its members' interests have been, are, and will be directly, adversely, and irreparably affected by the Service's violations of law. Defenders' members will continue to be harmed by the Service's unlawful actions unless this Court provides the relief prayed for in this Complaint.

**Defendant**

15.     Defendant U.S. Fish and Wildlife Service is an agency within the U.S. Department of Interior. The Service is the agency to which the Secretary of Interior has delegated the authority to conserve endangered and threatened species under the ESA, including responsibility for the Not Prudent Regulation and Listing Rule at issue in this case.

## STATUTORY FRAMEWORK

**Endangered Species Act**

16.     In 1973, recognizing that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA, 16 U.S.C. §§ 1531-1544, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(a)(2), (b).

17.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the

measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). In other words, the ESA's goal is not simply to prevent endangered and threatened species from becoming extinct but to recover these species to the point where they no longer require the statute's protections.

18.     Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA embodies the "plain intent" of Congress to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

19.     The ESA protects imperiled species by providing for their listing as "endangered" or "threatened." 16 U.S.C. § 1533(a). A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is threatened if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The term "species" also applies to a subspecies or to a distinct population segment ("DPS"). *Id.* § 1532(16).

20.     Under 16 U.S.C. § 1533(a)(1), listing is required if a species (or DPS) is endangered or threatened because of any of the following factors:

> **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;
> **(B)** overutilization for commercial, recreational, scientific, or educational purposes;
> **(C)** disease or predation;
> **(D)** the inadequacy of existing regulatory mechanisms; or
> **(E)** other natural or manmade factors affecting its continued existence.

21.     In making listing decisions, the Service must rely "solely on the basis of the best scientific and commercial data available," *id.* § 1533(b)(1)(A), "without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b).

22.     The ESA further protects imperiled species by directing that the Secretary, "to the maximum extent prudent and determinable—shall, concurrently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). Critical habitat is defined as both "(i) the specific areas within the geographical area occupied by the

species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" and "(ii) specific areas outside the geographical area occupied by the species . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A).

23.     The ESA directs the Secretary to designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2). The ESA further states that the Secretary

> may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

*Id.*

24.     Legislative history sheds light on the meaning of the statutory requirement that critical habitat be designated to the "maximum extent prudent." *Id.* § 1533(a)(3)(A). The House Report for the 1978 Amendments to the ESA, which set the language of 16 U.S.C. § 1533(a)(3)(A), states: "The phrase 'to the maximum extent prudent' is intended to give the Secretary the discretion to decide not to designate critical habitat . . . where it would not be in the best interests of the species to do so. . . . It is only in rare circumstances where the specification of critical habitat . . . would not be beneficial to the species." H.R. Rep. No. 95-1625, at 16–17 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9466–67. The Senate Report for the same amendments states: "The Secretary's authority to determine that designation is not prudent is retained, although it is with the express understanding that this authority is to be exercised only in rare situations." S. Rep. No. 106-126, at 10 (1999).

25.     After critical habitat is established, the ESA and its implementing regulations provide protections for that habitat. Specifically, any federal agency considering taking action that may affect critical habitat must consult with the relevant wildlife agency (which, for terrestrial

species, is the Service). 50 C.F.R. § 402.14(a). Through consultation, both the Service and the action agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to . . . result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

26.    The ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(C), under which this action is brought, provides that

> any person may commence a civil suit on his own behalf— . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to . . . order the Secretary to perform such act or duty, as the case may be.

## Administrative Procedure Act

27.    The APA provides the applicable standard of review. It provides for judicial review of "agency action," defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

28.    Under the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2). In examining the lawfulness of an agency action, the reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

## FACTS

### Development of the Not Prudent Regulation

29.    In 1984 the Service promulgated ESA regulations defining only two circumstances when designating critical habitat is not prudent: (1) "The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species," or (2) "Such designation of critical habitat would not be beneficial to the species." 49 Fed. Reg. 38,900, 38,909 (Oct. 1, 1984) (promulgating 50 C.F.R. § 424.12(a)(1)

(1984)). In proposing that regulatory language, the Service explained that "[t]he Endangered Species Act Amendments of 1978 established *a standard of benefit to the species* in determining whether it is prudent to designate Critical Habitat for that species." 48 Fed. Reg. 36,062, 36,063 (Aug. 8, 1983) (emphasis added). In the final rule, the Service explained:

> [T]he Services will examine the balance between risk to a species that might be a consequence of designating its critical habitat and benefits that the species might derive from such designation. . . . To the extent possible, the Services will attempt to undertake only those regulatory actions of *net benefit* to the conservation of species and their habitats. In those cases in which the possible *adverse consequences would outweigh the benefits* of designation of critical habitat, the Services may forego such designation as a matter of prudence.

49 Fed. Reg. at 38,903 (emphasis added).

30.    The Service revised these regulations for the first time in 2016, changing the language for the second not prudent circumstance to allow a "not prudent" determination where:

> Such designation of critical habitat would not be beneficial to the species. In determining whether a designation would not be beneficial, the factors the Services may consider include but are not limited to: Whether the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or whether any areas meet the definition of "critical habitat."

81 Fed. Reg. 7,414, 7,439 (2016) (finalizing 50 C.F.R. § 424.12(a)(1) (2016)). As shown, the Service added language indicating that where habitat degradation is "not a threat to the species," this is a "factor[] the Services *may* consider." *Id.* (emphasis added). The Service's 2016 language retained the "not be beneficial to the species" standard contained in the original 1984 language.

31.    The Service revised section 424.12(a)(1) again in 2019 to allow a "not prudent" determination where:

> The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act.

84 Fed. Reg. 45,020, 45,053 (Aug. 27, 2019) (the "2019 Amendments") (finalizing 50 C.F.R. § 424.12(a)(1)(ii) (2019)). In its 2019 Amendments, the Service fundamentally changed the

10                                                                                    Complaint

regulatory standard contained in the Not Prudent Regulation. The Service removed the "not a benefit" standard entirely. The Service then elevated the "not a threat" factor to the new not prudent standard. This new language and regulatory standard went into effect on September 26, 2019. *Id.* at 45,020.

32.     In 2024, the Service modified this language in part by removing the second clause of the regulatory provision (regarding habitat threats that cannot be addressed through consultation). 89 Fed. Reg. 24,300, 24,335 (Apr. 5, 2024) (the "2024 Amendments"). Otherwise, the 2024 Amendments retained the language from the 2019 Amendments. *Id.* That language remains in place today.

**The Sierra Nevada Red Fox**



Photo courtesy of Chaney Swiney

**Photo**: Chaney Swiney, Photograph of the Sierra Nevada Red Fox *in A Conservation Strategy for the Sierra Nevada Red Fox*, Sierra Nevada Red Fox Conservation Advisory Team 14 (2022), https://www.dfw.state.or.us/wildlife/management_plans/docs/A%20Conservation%20Strategy%20for%20the%20Sierra%20Nevada%20Red%20Fox_2022.pdf.

33.     The Sierra Nevada Red Fox is one of ten North American subspecies of red fox and one of three montane North American subspecies. Despite its name, the Fox's coat is not always pure red, but may also include black or tan colors. The Sierra DPS has unique alpine

11                                                                                                    Complaint

adaptations and physical characteristics. These include well-furred paws as part of its winter coat, longer hind legs, and a slightly smaller body size. Each of these adaptations is thought to help the Fox hunt in the snow. *See generally* Listing Rule.



Figure 8. Comparison of hair growth on toe pads of a Sacramento Valley red fox (left) and a SNRF (right) killed by vehicle strikes in January 2011. Photos courtesy of Mark Statham (left) and Mourad Gabriel (right).

**Photo**: Mark Statham (left) & Mourad Gabriel (right), Photograph Comparing Toe Pads of the Sacramento Valley Red Fox and the Sierra Nevada Red Fox *in A Conservation Strategy for the Sierra Nevada Red Fox*, Sierra Nevada Red Fox Conservation Advisory Team 35 (2022), https://www.dfw.state.or.us/wildlife/management_plans/docs/A%20Conservation%20Strategy%20for%20the%20Sierra%20Nevada%20Red%20Fox_2022.pdf.

34.     The Fox prefers cold subalpine and high-elevation areas (~8,100 to 11,000 feet), ranging from high-elevation meadows, rocky areas, and scrubland to conifer woodlands (largely mountain hemlock, lodgepole, and whitebark pine) that get heavy snow in winter. Listing Rule at 41,746. The Fox also occurs below those high elevations, including as it travels between its preferred high-elevation areas. Its food sources include rodents, snowshoe hares, and white-tailed jackrabbits as well as caches of whitebark pinenuts when available. *See* Species Status Assessment Report for the Sierra Nevada Distinct Population Segment of the Sierra Nevada Red Fox, U.S. Fish & Wildlife Serv. 17 (2018), https://ecos.fws.gov/ServCat/DownloadFile/169289 ("SSA").

35.     Range for the Sierra DPS of the Fox lies along the high Sierra from just south of the Lake Tahoe region southward through Yosemite and Sequoia-Kings Canyon National Parks.

*See* Listing Rule at 41,745. The below diagram shows the approximate current range of the Sierra DPS.



**Figure 1**—Approximate current range of the Sierra Nevada DPS of Sierra Nevada red fox. The range follows the Sierra crest (the north-to-south ridgeline of the Sierra Nevada mountain range), and includes known sighting locations and nearby high-quality habitat (Cleve *et al.* 2011, entire; Eyes 2016, attachments; Hiatt 2017, attachment; Quinn 2018a, attachments; Quinn 2018a, attachments; Stermer 2018, p. 1).

**Source:** Listing Rule at 41,746.

36.    Sonora Pass, a stronghold for the Sierra DPS, is near the center of the Sierra DPS's range, at the Tuolumne/Mono County line. The Fox also has been detected east of Yosemite National Park and south of Yosemite in the general area of Mono Creek.

37.    There have been new recent detections of the Fox within the Sierra DPS. *See, e.g.*, Listing Rule at 41,747. The Fox has been detected to the south of previous detections, around Mammoth Lakes, California. Foxes also have been documented moving between areas of detection.

38.    Despite the rise in recent detections, the Sierra DPS is critically endangered. At the time of listing, the Service estimated the population of the DPS at just eighteen to thirty-nine individuals. Listing Rule at 41,747.

**The Listing Rule and Critical Habitat Determination**

39.     The Service listed the Sierra DPS as endangered in August 2021. *Id*. at 41,743. In the Listing Rule, the Service identified the following major threats to the survival of the subpopulation:

> (1) Deleterious impacts associated with small population size, such as inbreeding depression and increased effects of deleterious stochastic events (Factor E); (2) over-hybridization with nonnative red fox (Factor E); and possibly (3) competition with coyotes (Factor E) resulting from reduced snowpack levels.

*Id*. at 41,748.

40.     In addition, in describing the risk factors affecting the DPS, the Service reviewed its prior analysis of "environmental and demographic characteristics important to the viability of the Sierra Nevada DPS," which formed part of the Service's 2018 SSA. *Id*. at 41,749. Those characteristics included: "(1) Extent of subalpine habitat, (2) deep winter snow cover, (3) and rodent and leporid (rabbit and hare) populations." *Id*. at 41,749.[1] The Service also noted the following risk factors affecting those environmental characteristics: "changing climate-related conditions, such as primary production levels and snowpack, which can affect coyote presence (and thus competition with Sierra Nevada DPS individuals) in high-elevation areas; prey availability; and potential impacts of habituation to humans and human-provided food sources." *Id*.

41.     Regarding snowpack levels and coyote presence, the Service explained that coyotes compete with Foxes for prey and also may prey directly on Foxes, and thus that Foxes require high-elevation areas without coyotes. *Id*. at 41,750. The Service acknowledged science that showed coyotes occupying high-elevation areas in the Sonora Pass area in competition with the Sierra DPS. *Id*. The Service stated:

> [T]he coyotes occupying high elevation areas near Sonora Pass during the winter may be negatively impacting Sierra Nevada DPS foxes by restricting them from

---

[1] In its proposed rule the Service also included a fourth important environmental characteristic of "presence of whitebark pine." 85 Fed. Reg. 862, 867 (Jan. 8, 2020).

hunting areas or den sites, by the threat of direct predation on adult foxes or cubs, and by generally reducing the carrying capacity of the area available for the foxes.

*Id*. The Service also noted that any death resulting from coyote presence was significant to the survival of the Sierra DPS. *Id*. Despite these factual findings the Service concluded that conditions surrounding snowpack depth were "adequate for the DPS's needs" during non-drought years. *Id*.

42.     Regarding prey availability, the Service acknowledged that prey populations "may be of concern" given that both the white-tailed jackrabbits and snowshoe hares have been identified as "species of special concern" in the Sierra Nevada. *Id*. Despite this factual finding, the Service concluded that prey abundance was "not . . . inadequate" for the Sierra DPS. *Id*.

43.     Regarding habituation, the Service explained that habituation "may expose Sierra Nevada DPS fox individuals to harm or injury, such as from dog attacks, dog diseases, and vehicle collisions." *Id*. The Service acknowledged multiple indicators of habituation for the Sierra DPS, including evidence that Foxes have approached hikers or snowmobilers and have eaten trash left by soldiers after training exercises at the U.S. Marine Corps Mountain Warfare Training Center located in the Sierra DPS's range. *Id*. The Service provided an example of a Fox death in a related population due to habituation. *Id*. Despite these factual findings, the Service concluded that habituation was not likely to affect the Sierra DPS. *Id*.

44.     Overall, the Service concluded that "there are not any current or future significant habitat-based threats" to the Sierra DPS. *Id*. at 41,749.

45.     The Service went on to decline to designate critical habitat for the Sierra DPS, concluding that designation was not prudent. *Id*. at 41,752. Paraphrasing the Not Prudent Regulation, the Service stated that it made its not prudent determination because "the present or threatened destruction, modification, or curtailment of habitat or range is not a threat to the Sierra Nevada DPS, and habitat does not appear to be a limiting factor for the species." *Id*. As support, the Service pointed to the analysis in the 2020 Proposed Listing Rule, 85 Fed. Reg. 862 (Jan. 8, 2020). *Id*.

15                                                                              Complaint

46.    In the Proposed Listing Rule, the Service explained that the primary threats identified for listing the species do not "fall in the category of present or threatened destruction, modification, or curtailments of the fox's habitat." 85 Fed. Reg. at 872. The Service further explained that there is protected adjacent habitat available for range expansion, so habitat is not a limiting factor for the Sierra DPS. *Id*. The Service noted that while "changing climate conditions" are expected to affect the important environmental characteristics identified by the Service, "those changes are not currently expected, nor in the future projected, to result in significant negative influences on the viability of the DPS." *Id*. The Service stated that based on its analysis, "the present or threatened destruction, modification, or curtailment of the Sierra Nevada red fox's habitat is not a *significant* threat to the species," and therefore designating critical habitat was not prudent. *Id*. (emphasis added).

47.    In the Listing Rule, the Service also offered the following explanation:

> We presented several potential causal connections between habitat conditions and their importance to the Sierra Nevada DPS, as well as scenarios related to possible future trajectories of the risk factors that could affect those habitat conditions. As we analyzed these potentialities, we determined that the relative importance of potential causal connections was lower than presented in some scenarios, and that the most likely scenario of future conditions would exhibit a lower overall risk to the DPS's habitat. As such, we conclude that there are not any current or future significant habitat-based threats.

Listing Rule at 41,749.

48.    The above determinations were based on the standard set out in the Not Prudent Regulation that "destruction, modification, or curtailment of a species' habitat or range is not a threat to the species." *See* 50 C.F.R. § 424.12(a)(1)(ii). The Service did not find that designation of critical habitat would "not be beneficial to the species"—i.e., did not apply the previously applicable regulatory criterion for a not prudent determination. *See* 81 Fed. Reg. 7,414, 7,439 (2016).

**Unexamined Impacts to the Sierra DPS's Habitat**

49.    The Service's decision to discount habitat-based threats to the Sierra DPS ignores or improperly downplays several relevant impacts to the habitat of the Sierra DPS. In addition, the Service failed to draw a rational connection between the facts found (regarding threats to the

1    Sierra DPS's habitat) and the conclusion made (that these threats do not warrant critical habitat

2    designation).

3        50.    The Sierra DPS's current and historical range overlap heavily with federal lands.

4    Portions of the range span five National Forests: Eldorado, Humboldt-Toiyabe, Inyo, Sierra, and

5    Stanislaus. The range also spans portions of Yosemite National Park and Sequoia & Kings

6    Canyon National Parks. Additionally, the U.S. Marine Corps Mountain Warfare Training Center

7    sits in the Sierra DPS's range, near Sonora Pass, where Foxes have been detected multiple times.

8        51.    Some portions of those public lands are designated wilderness that is protected

9    from most development. However, significant portions of those lands which are not designated

10   wilderness are open to development and use (such as grazing and snowmobiling) under the

11   relevant land management plans. Those uses, and their impacts on Fox habitat, are discussed

12   below. The Service failed to adequately evaluate the full extent of those uses of habitat and their

13   impact on the Fox.

14       52.    In areas where human uses impact Fox habitat, designation of critical habitat

15   would increase protection for the Fox by incorporating analysis of impacts on Fox habitat into

16   future federal management actions. As explained above, the ESA prohibits federal actions that are

17   likely to destroy or adversely modify critical habitat. To guard against such harms, the ESA

18   requires interagency consultation for any federal action that may affect critical habitat. Without

19   critical habitat designated for the Sierra DPS, these important protections will be bypassed.

20                                    Snowmobiling

21       53.    Habitat for the Sierra DPS on U.S. Forest Service land is currently used for

22   snowmobiling, to the Fox's detriment.

23       54.    Snowmobiling is relevant to multiple environmental characteristics identified by

24   the Service as important to the viability of the Sierra DPS. First, snowmobiling negatively

25   impacts subnivean mammals—primarily mice and voles that live in and depend on tunnels in the

26   snow for shelter, movement, and food storage and that serve as an important prey source for the

27   Fox.

28

17                                                              Complaint

55.    Second, snowmobiling compacts snow cover, allowing coyotes to reach winter areas they otherwise would not be able to reach and to compete with or prey on Foxes in those areas.

56.    Third, snowmobiling increases opportunities for the habituation of Foxes to human presence, which endangers their safety. For example, the Bridgeport Winter Recreation Area is a snowmobile area of over 7,000 acres in the Humboldt-Toiyabe National Forest. Snowmobiles are also allowed in large "semi-primitive" areas adjacent to that area. The area is in the Sierra DPS's range and near known occurrences of the Fox. The area is managed under the Bridgeport Winter Recreation Area Management Plan (May 2010) and West Hoover Travel Management Plan for the Humboldt-Toiyabe National Forest (2005), both of which were developed before the Fox was discovered in the area in 2010.

57.    Snowmobiling is also allowed in the Stanislaus National Forest in the Pacific Valley and Eagle areas. The Stanislaus National Forest Over-Snow Vehicle Management Plan allows snowmobiling on 119,104 acres of the Forest, including areas that overlap with detections of the Fox. The Service was aware of this issue in crafting the Listing Rule, as commenters on the Listing Rule alerted the Service to the likelihood of snowmobiling in the Pacific Valley and Eagle areas. Listing Rule at 41,754.

58.    The Eldorado National Forest also allows snowmobiling on 458,600 acres of the Forest. The areas open to snowmobiling overlap with the Sierra DPS's range and Foxes have been sighted near some of the open areas.  New, ongoing management plans maintain hundreds of thousands of acres open for over-snow vehicle use.

59.    In evaluating habitat threats to the Fox, the Service failed to consider the full impacts of current and future snowmobiling. The Service did not address snowmobiling in its analysis of the risks to environmental characteristics important to the viability of the Sierra DPS.

60.    The Service received multiple comments regarding snowmobiling and was aware of the issue in connection with the Listing Rule. However, the Service inadequately addressed those comments, summarily dismissing the effects of snowmobiling and resulting snow compactions despite noting, with respect to the Stanislaus National Forest in particular, that

18                                                                                          Complaint

1    impacts depend "on several variables, including . . . the number of snowmobiles allowed and

2    Sierra Nevada DPS foxes in the two areas, and the extent of resulting snow compactions." 86 Fed.

3    Reg. at 41,754.

4         61.    The Service did not discuss snowmobiling in its determination that there were no

5    significant habitat threats to the Sierra DPS and its critical habitat determination. The Service did

6    not make any finding that increased habitat protection from snowmobiling would not benefit the

7    Sierra DPS.

8                                          Grazing

9         62.    There are active Forest Service grazing allotments throughout each of the five

10   National Forests that make up the Sierra DPS's range. Many of those grazing allotments overlap

11   with both the range and known detections of the Fox, particularly in the Sonora Pass area.

12        63.    Grazing can harm Fox habitat by negatively affecting the abundance, density, peak

13   biomass, and occupancy of small mammals which serve as a primary food source for the Fox.

14   Grazing removes vegetation that small mammal species rely on for cover and forage. Multiple

15   scientific studies have shown that the abundance of small mammals in alpine areas decreases in

16   grazed areas compared to ungrazed areas.

17        64.    To provide one example of a relevant grazing project, the Bridgeport Southwest

18   Rangeland Project in the Humboldt-Toiyabe National Forest was finalized in 2022 and approved

19   cattle grazing on up to 10,048 acres of suitable Fox habitat. There have been twelve Fox

20   detections within five miles of the project area. The project was under consideration in 2021

21   when the Service finalized the listing and critical habitat determination for the Sierra DPS.

22        65.    The grazing allotments are subject to programmatic conservation measures for

23   other endangered and threatened species, such as the Yosemite toad and willow flycatcher,

24   contained in the 2004 Sierra Nevada Forest Plan Amendments which cover the Eldorado,

25   Humboldt-Toiyabe, Inyo, Stanislaus, and Sierra National Forests. The 2004 Sierra Nevada Forest

26   Plan Amendments do not include conservation measures relevant to the Fox and the Fox's prey.

27        66.    In the Listing Rule's evaluation of habitat threats to the Fox, the Service failed to

28   consider the full impacts of current and future grazing. The Service did not address grazing in its

19                                                                                      Complaint

analysis of risk factors to environmental characteristics important to the viability of the Sierra DPS. The Service was aware of the issue, as it received a comment about the impact of grazing. Listing Rule at 41,754. The Service inadequately addressed that comment, simply stating that the Sierra DPS "typically" occurs at elevations above grazing areas, despite evidence that grazing allotments do overlap with the range and detections of the Sierra DPS. *Id.*

67.    The Service did not discuss grazing impacts to the Fox's prey in its determination that there were no significant habitat threats to the Sierra DPS or its decision that designation of critical habitat was not prudent. The Service did not find that there is no benefit in reducing grazing impacts on the Fox's prey species.

<u>Military Training</u>

68.    The area occupied by the U.S. Marine Corps Mountain Warfare Training Center overlaps with known sightings of the Fox within the Sierra DPS. The Integrated Natural Resources Management Plan for the training center provides some provisions for avoiding Fox dens, and also includes some provisions on trash cleanup. However, the plan incorrectly identifies the relevant dates during which avoiding disturbance is most critical. Listing Rule at 41,749. (Specifically, according to the Listing Rule a table in the plan incorrectly identifies the dates during which disturbance of the den sites must be avoided, although the center's annual operating plan reflects the correct dates.)

69.    In the Listing Rule, the Service discussed the impacts of the training center on the Fox solely in connection with habituation. *Id.* at 41,750. The Service did not consider other types of impacts, including impacts to prey populations or snow compaction.

70.    The ESA, 16 U.S.C. § 1533(a)(3)(B)(i), allows the Service to designate as critical habitat Department of Defense lands (such as the Mountain Warfare Training Center) that are managed under an Integrated Natural Resources Management Plan, but only if the Secretary determines that the Plan provides no benefit to the species. Here, there has not been a formal determination as to benefit.

20                                                                                    Complaint

# CLAIMS FOR RELIEF

## First Claim for Relief

### Not Prudent Regulation Violates the ESA and APA

71.     Plaintiffs hereby reallege and incorporate each and every allegation set forth in this Complaint as if set out in full below.

72.     The text, structure, purpose, and history of the ESA shows that Congress intended the not prudent exception to the designation of critical habitat to be used only in the rare case in which designation would not benefit a species. The Not Prudent Regulation is contrary to this clear intent.

73.     The plain language of the ESA imposes a *mandatory* duty to designate critical habitat to the *maximum* extent prudent. By using the word "maximum," Congress intended that critical habitat be designated to the fullest feasible extent. It follows that exceptions must be narrowly drawn.

74.     The interpretation of the statute reflected in the Not Prudent Regulation contradicts this intent. Rather than a narrow exception for situations where designation would create an unwise detriment to the species, the Service has created a broad exclusion that it applies to a range of situations in which the dangers of habitat destruction are overshadowed by other threats. This is true in the case of the Fox: the Fox could certainly benefit from habitat protection, as explained above, and indeed the Service has never argued that there would be no benefit to the Fox from designation—and yet the Not Prudent Regulation was invoked to withhold that protection.

75.     Moreover, to the extent the Service justifies the Not Prudent Regulation by interpreting the ESA to allow for cost-benefit analysis in prudence determinations, the structure of the ESA forecloses this approach. As set forth in the Statutory Framework section above, the ESA sets up a first-order duty for the Service to designate critical habitat to the maximum extent prudent. *After* the Service has made that first-order determination, the Service *then* has discretion, as a second-order function, to balance the benefits of excluding areas against the benefits of

1    designation. Under the statute, that balancing does not occur during the first-order designation.

2    The Not Prudent Regulation contradicts this structure by merging the inquiries.

3        76.    In addition, the recovery purpose of the ESA supports a narrow reading of

4    exceptions to critical habitat designation, in contrast to the broad exception set forth in the Not

5    Prudent Regulation. The ESA is intended to conserve listed species and their ecosystems, with

6    "conserve" defined to mean species recovery. 16 U.S.C. §§ 1531(b), 1532(3). Critical habitat

7    designation is intended to serve that recovery purpose. In fact, "critical habitat" is defined as

8    habitat essential for species conservation—i.e. (per statutory definitions) recovery. *Id.* §§

9    1532(5)(A)(i) (occupied critical habitat); 1532(5)(A)(ii) (unoccupied critical habitat). Taken

10    together, these provisions evince clear intent (a) to recover species and (b) that critical habitat

11    play a role in achieving conservation and recovery. Expanding the not prudent exception in a way

12    that makes it easier to decline to designate critical habitat—as the Not Prudent Regulation does—

13    is contrary to that clear intent.

14        77.    Likewise, the legislative history of the not prudent exception to critical habitat

15    designation, recited in the Statutory Framework section above, shows that it was intended to be

16    narrow and applied only in instances where designation would not benefit the species.

17        78.    Courts interpreting the "not prudent" exception consistently hold, per the ESA's

18    text, structure, purpose, and history, that the exception applies *only* when designation provides no

19    net benefit to the species. *E.g.*, *NRDC v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1126 (9th Cir.

20    1997) (rejecting an "expan[sion of] the narrow statutory exception for imprudent designations

21    into a broad exemption for imperfect designations," declaring such an expansion to be

22    "inconsistent with clear congressional intent."); *Conservation Council for Hawai'i v. Babbitt*, 2 F.

23    Supp. 2d 1280, 1283–84 (D. Haw. 1998) ("The ESA . . . requires the designation of critical

24    habitats in all but rare cases," and the statute "establishes a general rule that designation should be

25    made unless there is evidence that such a designation is not beneficial."); *see also Center for

26    Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1091 (D. Ariz. 2009) ("Congress

27    intended the imprudence exception to be invoked rarely and only under extraordinary

28    circumstances," and "[i]t is not apparent that these circumstances are present here."); *Jumping

1    *Frog Research Institute v. Babbitt*, 1999 WL 1244149, at *1 (N.D. Cal. Dec. 15, 1999) (rejecting

2    the Service's not-prudent reasoning because "the Service failed to consider the possible benefits

3    of designation."). Although these opinions arose under the prior version of 50 C.F.R. §

4    424.12(a)(1) (which more closely aligned the "not prudent" exception with the statutory "no

5    benefit" standard), the courts' analysis of the statute itself continues to apply.

6         79.    The Service lacks authority to adopt regulations that contradict the ESA. Under the

7    APA, courts hold unlawful and set aside federal actions that are "not in accordance with law," 5

8    U.S.C. § 706(2)(A), or "in excess of statutory . . . authority," *Id.* § 706(2)(C). Here, the Not

9    Prudent Regulation is not in accordance with law and beyond the Service's authority in violation

10   of the APA, 5 U.S.C. § 706(2).

11                              **Second Claim for Relief**

12        **Not Prudent Determination for the Sierra DPS Violates the ESA and APA**

13        80.    Plaintiffs hereby reallege and incorporate each and every allegation set forth in this

14   Complaint as if set out in full below.

15        81.    In determining that critical habitat designation was not prudent for the Sierra DPS,

16   the Service relied on the Not Prudent Regulation, 50 C.F.R. § 424.12(a)(1)(ii). The Service based

17   its not prudent determination on its finding that "destruction, modification, or curtailment of a

18   species' habitat or range is not a threat to the Sierra Nevada red fox." *See* 85 Fed. Reg. at 872;

19   Listing Rule at 41,752 (integrating reasoning and analysis from proposed rule). The Service failed

20   to evaluate the benefits of designating critical habitat for the Sierra DPS.

21        82.    The APA allows a reviewing court to "hold unlawful and set aside agency action,

22   findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

23   otherwise not in accordance with law." 5 U.S.C. § 706(2).

24        83.    The Service's determination that critical habitat was not prudent is arbitrary and

25   capricious and a violation of the ESA requirement to designate critical habitat to the maximum

26   extent prudent and determinable. The Service inappropriately invoked the not prudent exception

27   to critical habitat determination based on the unlawful Not Prudent Regulation. The Service did

28   not discuss the benefits of critical habitat designation to the Sierra DPS and did not apply the

1    correct "critical habitat is not a benefit to the species" standard in determining that critical habitat

2    for the Sierra DPS was not prudent. The Service's failure to apply the correct standard in making

3    this evaluation renders its decision arbitrary and capricious and in violation of the ESA and the

4    APA.

5    **Third Claim for Relief**

6    **Alternatively, Not Prudent Determination is Arbitrary and Capricious and Violates APA**

7    84.    Plaintiffs hereby reallege and incorporate each and every allegation set forth in this

8    Complaint as if set out in full below.

9    85.    In the alternative, and even if the Not Prudent Regulation is lawful (which, as

10    explained above, it is not), the Service's application of the Not Prudent Regulation in the Listing

11    Rule was arbitrary and capricious and not in accordance with law.

12    86.    Specifically, the Service's conclusion that designation of critical habitat was not

13    prudent because "the present or threatened destruction, modification, or curtailment of the Sierra

14    Nevada red fox's habitat is not a *significant* threat to the species," 85 Fed. Reg. at 872 (emphasis

15    added), is unsupported and contrary to the standard set forth in the current version of 50 C.F.R. §

16    424.12(a)(1)(ii).

17    87.    Under the current regulatory standard, critical habitat designation is only not

18    prudent where "destruction, modification, or curtailment of a species' habitat or range is not a

19    threat to the species." 50 C.F.R. § 424.12(a)(1)(ii).

20    88.    The Service did not, and could not, find that the Sierra DPS faced no threats to its

21    habitat. As a threshold matter, the Service did not articulate a reason that habitat destruction does

22    not threaten the Fox, let alone connect that reason to the underlying facts. The Service stated that

23    "the most likely scenario of future conditions would exhibit a lower overall risk to the DPS's

24    habitat" and that therefore "there are not any current or future significant habitat-based threats."

25    Listing Rule at 41,749. This does not square with the Not Prudent Regulation, under which

26    "[d]esignation of critical habitat may not be prudent" if "[t]he present or threatened destruction,

27    modification, or curtailment of a species' habitat or range is *not a threat* to the species." 50 C.F.R.

28    § 424.12(a)(1) (emphasis added). The Service did not conclude that there is no "present or

threatened" destruction of Fox habitat. It stated, instead, that there is a "lower overall" future risk to habitat, and that there are no "current or future *significant* habitat threats." The Service applied an incorrect, less-protective standard.

89.    The Service acknowledged that even the death of one Fox was significant to the viability of the Sierra DPS. Listing Rule at 41,750. The Service noted multiple risks directly related habitat including competition with coyotes caused by snowpack which is exacerbated by snowmobiling, prey availability which is impacted by grazing, and habituation which is impacted by recreation and military training activities in the area, any of which could result in the harm or death of a Fox. Yet, the Service concluded that despite the known risks and sensitivity of the species, none of those impacts presented threats to the Sierra DPS. That conclusion is inadequately supported and contrary to the evidence before the Service, rendering it arbitrary and capricious.

90.    Additionally, the Service failed to adequately consider relevant and important habitat-based risks to the Fox. The Service ignored or minimized impacts from snowmobiling, grazing, and military training on the environmental characteristics necessary for the viability of the Sierra DPS. The existence of those impacts was before the Service. The Service's choice to not fully address those impacts further renders its conclusion that there are no habitat threats that threaten the Sierra DPS arbitrary and capricious.

91.    Accordingly, even if the Not Prudent Regulation were lawful (which it is not), the Service's application of the regulation to the Sierra DPS in the Listing Rule was in violation of the regulation and arbitrary and capricious in violation of the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1.  Declare that the Not Prudent Regulation, as reflected in the 2019 Amendments and 2024 Amendments, violates the ESA and APA because it contradicts Congress's intent that the statutory not prudent exception apply only where designation of critical habitat would not benefit the species;

2.  Vacate and remand the Not Prudent Regulation to the Service, such that the 2016 version of 50 C.F.R. § 424.12(a)(1), which preceded the 2019 Amendments and 2024 Amendments, remains in place during the remand;

3.  Declare that the Service's not prudent determination for the Sierra DPS, set forth in the Listing Rule, was arbitrary and capricious and violated the ESA;

4.  Remand the Service's critical habitat determination for the Sierra DPS and order the Service to conduct that analysis under the 2016 version of 50 C.F.R. § 424.12(a)(1);

5.  In the alternative, and even if the Not Prudent Regulation is lawful, declare that the not prudent determination for the Sierra DPS, set forth in the Listing Rule, was arbitrary and capricious even under the Not Prudent Regulation, and remand the portion of the Listing Rule that determines that the designation of critical habitat for the Sierra Nevada DPS is not prudent with instructions that the Service lawfully apply the Not Prudent Regulation;

6.  Award Plaintiff their reasonable costs, and expenses, including attorney fees, associated with this litigation; and

7.  Award Plaintiff any other further and additional relief as this Court may deem just and proper.

Dated: Jan. 6, 2025                    /s/ Ellen Medlin Richmond

ELLEN MEDLIN RICHMOND
(CA Bar No. 277266)
DEFENDERS OF WILDLIFE
600 17th Street
Suite 450N
Denver, CO 80202
Telephone: 720-943-4284
Email: erichmond@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*