ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH L. FLAX, Deputy Section Chief
NICOLE M. SMITH, Assistant Section Chief

SARA M. WARREN, Trial Attorney (GA Bar 966948)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 598-5785
Fax | (202) 305-0275
E-mail: Sara.Warren@usdoj.gov

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br><br>　　　　　Defendant. | Case No.  2:25-cv-00045-DAD-CKD<br><br>FEDERAL DEFENDANT'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO STAY OR REMAND AND OPPOSING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>Date: March 2, 2026<br>Time: 1:30 p.m.<br>Judge: Dale A. Drozd<br>Location: Zoom |

1

**TABLE OF CONTENTS**

2

3 INTRODUCTION ....................................................................................................... 1

4 FACTUAL BACKGROUND ...................................................................................... 2

5    I.   The Sierra Nevada DPS of the Sierra Nevada Red Fox ................................ 2

6    II.  Endangered Species Status and "Not Prudent" Determination for the Sierra Nevada DPS ................................................................................................... 4

7 STATUTORY BACKGROUND .................................................................................. 6

8

9    I.   The Endangered Species Act ....................................................................... 6

   II.  Implementing Regulations on Criteria for Designating Critical Habitat ............................ 7

10 STANDARD OF REVIEW ....................................................................................... 8

11

12 ARGUMENT ........................................................................................................... 10

   I.   The Court Should Stay Plaintiff's Facial Challenge to the "Not Prudent" Regulation

13      or, in the Alternative, Remand the Regulation to the Service Without Vacatur ............... 10

14    II.  The "Not Prudent" Rule Is Valid on Its Face ............................................. 11

15    III.  Plaintiff Waived Any Challenge to the "Not Prudent" Determination by Not Raising It During Notice-and-Comment Rulemaking .................................................... 13

16    IV.  The Service's Determination That Designating Critical Habitat for the Sierra Nevada DPS of the Sierra Nevada Red Fox Was Not Prudent Is Rational and Complies with the ESA and Its Implementing Regulations. .................................................... 14

17    V.  The Service Lawfully Applied Its "Not Prudent" Regulation .......................... 16

18    VI.  Plaintiff's Argument that the Service Overlooked Threats from Snowmobiles and Livestock Grazing Are Unfounded ............................................................... 17

19       A.  The Service rationally determined that potential habitat impacts associated with snowmobiling were not a threat to the Sierra Nevada DPS. .................. 18

20       B.  The Service rationally determined that potential habitat impacts associated

21         with livestock grazing were not a threat to the Sierra Nevada DPS. ............. 21

22 REMEDY ............................................................................................................... 24

23 CONCLUSION ....................................................................................................... 25

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*All. for the Wild Rockies v. Petrick*,
   68 F.4th 475 (9th Cir. 2023).............................................................................................. 14

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019)........................................................................................................ 13

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983)................................................................................................. 8, 9, 16

*Bear Valley Mut. Water Co. v. Salazar*,
   No. SACV 11–01263–JVS, 2012 WL 5353353 (C.D. Cal. Oct. 17, 2012)............................. 13

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)..................................................................................................... 9, 23

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
   889 F.3d 584 (9th Cir. 2018)........................................................................................ 10

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
   No. 24-4542, 2025 WL 2460946 (9th Cir. Aug. 27, 2025)............................................ 9

*Conservation Council for Haw. v. Babbitt*,
   2 F. Supp. 2d 1280 (D. Haw. 1998) ............................................................................ 12

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service*,
   No. 22-cv-1877-RDM, 2025 U.S. Dist. LEXIS 132666 (D.D.C. July 11, 2025) ............ 12

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service*,
   67 F.4th 1027 (9th Cir. 2023)...................................................................................... 13

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018)...................................................................................... 17

*Ethyl Corp. v. Browner*,
   989 F.2d 522 (D.C. Cir. 1993) ..................................................................................... 10

*Exxon Mobil v. U.S. EPA*,
   217 F.3d 1246 (9th Cir. 2000)...................................................................................... 14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...................................................................................................... 10

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986)......................................................................................... 9

*Greater Yellowstone Coal., Inc. v. Servheen*,
　665 F.3d 1015 (9th Cir. 2011) ................................................................. 17

*Landis v. N. Am. Co.*,
　299 U.S. 248 (1936) ................................................................................. 10

*Lands Council v. McNair*,
　537 F.3d 981 (9th Cir. 2008) ............................................................... 9, 16

*Li v. Keisler*,
　505 F.3d 913 (9th Cir. 2007) .................................................................. 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ..................................................................................... 8

*Nat. Res. Def. Council v. EPA*,
　38 F.4th 34 (9th Cir. 2022) ...................................................................... 10

*Nat. Res. Def. Council v. U.S. Dep't of the Interior*,
　113 F.3d 1121 (9th Cir. 1997) ................................................................. 12

*Nat'l Hydropower Ass'n v. U.S. Fish & Wildlife Serv.*,
　No. CV 24-2285, 2025 WL 1555156 (D.D.C. June 2, 2025) ............... 2, 10

*Reno v. Flores*,
　507 U.S. 292 (1993) ................................................................................. 10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
　747 F.3d 581 (9th Cir. 2014) ................................................................. 8, 9

*Sims v. Apfel*,
　530 U.S. 103 (2000) ................................................................................. 14

*Tibble v. Edison Int'l*,
　843 F.3d 1187 (9th Cir. 2016) ................................................................. 12

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
　671 F.3d 1113 (9th Cir. 2012) ................................................................... 9

*United States v. Salerno*,
　481 U.S. 739 (1987) ................................................................................. 10

*Univ. Health Servs., Inc. v. Thompson*,
　363 F.3d 1013 (9th Cir. 2004) ................................................................. 14

*UOP v. United States*,
　99 F.3d 344 (9th Cir. 1996) ..................................................................... 24

Defendant's Mem. in Support of Cross-Motion for Summary Judgment and Motion
to Stay or Remand and Opposition to Plaintiff's Motion for Summary Judgment

iv

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ........................................................................... 10

*Waterkeeper All. v. U.S. EPA*,
   140 F. 4th 1193 (9th Cir. 2025) ....................................................... 14

**Statutes**

5 U.S.C. §§ 701-706 ............................................................................ 8

5 U.S.C. § 706(2)(A) ........................................................................... 8

16 U.S.C. § 1531(b) ........................................................................ 6, 13

16 U.S.C. § 1532(5)(A) ....................................................................... 6

16 U.S.C. § 1532(16) ........................................................................... 6

16 U.S.C. § 1533(a)(1) ......................................................................... 6

16 U.S.C. § 1533(a)(1)(A) .................................................................. 16

16 U.S.C. § 1533(a)(1)(E) .................................................................. 17

16 U.S.C. § 1533(a)(3)(A) .................................................................... 6

16 U.S.C. § 1533(b)(1)(A) .................................................................... 6

16 U.S.C. § 1536(a)(2) ................................................................... 7, 18

16 U.S.C. § 1538(a)(1) ....................................................................... 18

16 U.S.C. § 1636(a)(2) ....................................................................... 20

Omnibus Public Land Management Act of 2009,
   Pub. L. No. 111-11, § 1806, 123 Stat. 1059 (codified at 16 U.S.C. § 460vvv) ........................ 19

**Executive Orders**

Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) .................................... 1, 2

Exec. Order 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) ....................................... 2

Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) .................................... 1, 2

**Regulations**

50 C.F.R. § 402.01(b) ................................................................................................ 2

50 C.F.R. § 424.12(a)(1) ............................................................................ 1, 7, 13, 18

50 C.F.R. § 424.12(a)(1) (2020) ........................................................................ passim

50 C.F.R. § 424.12(a)(1) (2025) ................................................................................ 8

**Federal Register**

80 Fed. Reg. 60990 (Oct. 8, 2015) ............................................................................ 4

81 Fed. Reg. 7414 (Feb. 11, 2016) .......................................................................... 11

83 Fed. Reg. 35193 (July 25, 2018) ........................................................................ 11

84 Fed. Reg. 45020 (Aug. 27, 2019) .............................................................. 8, 11, 12

85 Fed. Reg. 862 (Jan. 8, 2019) ........................................................................... 5, 7

86 Fed. Reg. 41743 (Aug. 3, 2021) ........................................................................... 1

89 Fed. Reg. 24300 (Apr. 5, 2024) ................................................................. 8, 11, 12

**INTRODUCTION**

In a single complaint, Plaintiff presents two fundamentally different Endangered Species Act ("ESA") lawsuits to the Court. The first is a straightforward challenge to the U.S. Fish and Wildlife Service's ("Service") determination that it was not prudent to designate critical habitat for an endangered species. Specifically, the Service issued a final rule listing the Sierra Nevada Distinct Population Segment ("DPS") of the Sierra Nevada red fox as an endangered species, but determining it was not prudent to designate critical habitat for the Sierra Nevada DPS because the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species. Endangered Species Status for the Sierra Nevada Distinct Population Segment of the Sierra Nevada Red Fox ("Final Rule"), 86 Fed. Reg. 41,743 (Aug. 3, 2021); FWS-000198-213. As explained below, that determination is committed to the judgment and expertise of the Service. The Service made a rational choice not to designate critical habitat because the Sierra Nevada DPS is not threatened by habitat-based factors; that choice is entitled to substantial deference.

The second lawsuit is framed as a facial attack on the "not prudent" regulation in the ESA implementing regulations, 50 C.F.R. § 424.12(a)(1). Plaintiff attacks a non-exhaustive list of example scenarios in which the Service may exercise its judgment to determine it is "not prudent" to designate critical habitat for a species, even though Plaintiff only claims to be harmed by one example. With this outsized challenge to a single provision, Plaintiff joins a patchwork of existing litigation in district courts challenging the ESA implementing regulations promulgated in 2024. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, No. 4:24-cv-4651 (N.D. Cal.); *Am. Farm Bureau Fed'n., v. U.S. FWS*, No. 1:25-cv-947-SLS (D.D.C.); *Nat'l Hydropower Ass'n, et al. v. U.S. Dep't of the Interior*, No. 1:24-cv-2285-SLS (D.D.C.).

This Court need not join the fray. President Trump issued Executive Orders in January and February 2025 that inform the rulemaking process. *See, e.g.*, Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025); Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025). Executive Order 14219 directs agencies to review regulations, like the 2024 regulations, for consistency with lawful "delegations of legislative power" and to ensure such regulations "are based on … the

best reading of the underlying statutory authority or prohibition." *Id.* Executive Orders 14154 and 14156, in turn, direct the agencies to review regulations, including the ESA regulations, and revise or rescind any regulations that impose undue burdens or are contrary to law. *See* Exec. Order No. 14154 § 3(c), 90 Fed. Reg. 8353; Exec. Order No. 14156 § 6(c), 90 Fed. Reg. 8433, 8436 (Jan. 20, 2025). And the Secretary of the Interior directed the Department to develop a plan to "suspend, revise, or rescind" the 2024 Section 4, 4(d), and 7 regulations. See Secretary's Order No. 3418 (Feb. 3, 2025) (https://www.doi.gov/document-library/secretary-order/so-3418-unleashing-american-energy).

As relevant here, the Service and National Marine Fisheries Service[1] have started rulemaking to reconsider the 2024 ESA regulations. They have prepared proposed rules and, following required intergovernmental reviews, intend to submit them to the Office of the Federal Register by October 31, 2025. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior,* No. 4:24-cv-4651 (N.D. Cal.), ECF Nos. 43-1, 43-2; *Nat'l Hydropower Ass'n, et al. v. U.S. Dep't of the Interior*, No. 1:24-cv-2285-SLS (D.D.C.), ECF Nos. 19-1, 19-2. Following public comments, any public meetings, and intergovernmental reviews, the Services anticipate submitting final rules to the Office of the Federal Register by October 31, 2026. Recognizing the effects of the rulemaking on legal challenges to the 2024 regulations, the District of Columbia stayed another challenge to part of the 2024 regulations implementing ESA Section 7. *Nat'l Hydropower Ass'n v. U.S. Fish & Wildlife Serv.*, No. CV 24-2285, 2025 WL 1555156 (D.D.C. June 2, 2025).[2] The Court should do the same here.

## FACTUAL BACKGROUND

### I.    The Sierra Nevada DPS of the Sierra Nevada Red Fox

The Sierra Nevada red fox is one of ten subspecies of red fox in North America. FWS-000200. Red foxes are small, doglike mammals with elongated snouts, pointed ears, and

---

[1] The Secretaries of the Interior and Commerce are responsible for implementing the ESA, and they have delegated their respective responsibilities to the Service and the National Marine Fisheries Service. The Service has responsibility for terrestrial and freshwater species, including the Sierra Nevada DPS of the Sierra Nevada Red Fox. *See* 50 C.F.R. § 402.01(b).

[2] A motion for stay is also under consideration in *Am. Farm Bureau Fed'n., v. U.S. FWS*, No. 1:25-cv-947-SLS (D.D.C.).

bushy tails. Red foxes also have black markings on the backs of their ears, black shins, and white tips on their tails. *Id.* Compared to other species of red fox, the Sierra Nevada red fox is particularly adapted to cold weather, with a thick winter coat, long hind feet, and small toe pads covered in fur, which are thought to facilitate its movement over snow. *Id.* Sierra Nevada DPS foxes are opportunistic predators of small mammals including rodents, hares, and rabbits. They also eat nuts from whitebark pine trees. FWS-000120.

The Sierra Nevada DPS lives at high elevations along the crest of the Sierra Nevada mountains at elevations between 8,100 and 11,600 feet in subalpine habitat situated between the tree line and the montane forests. FWS-000200-01. Sierra Nevada DPS foxes prefer higher elevations, and fewer than 3% of Sierra Nevada red fox genetic detections occur below 9,000 feet. FWS-000122, FWS-012378. It is also smaller in size than red fox subspecies living at low elevations, a possible adaptation to its high-altitude habitat, or a result of reduced prey availability at high elevations. FWS-000200. With these unique adaptations, Sierra Nevada DPS foxes can survive in an environment that is hostile to other species. Its preferred habitat is a patchwork of high-elevation meadows, rocky areas, scrub vegetation, and patchy woodlands. FWS-000201. This habitat has heavy snow cover, a short growing season of just seven to nine weeks, and trees stunted by winds and extreme cold. *Id.* The low temperatures, short growing season, and low primary productivity of its subalpine habitat lead to relatively low populations of prey species, but that relative scarcity also causes coyotes—both a predator and competitor of the Sierra Nevada DPS—to avoid the fox's preferred habitat. FWS-000122, FWS-000205.

In the twentieth century, the population declined significantly. FWS-000118. At the time of listing, the population estimate for the Sierra Nevada red fox was approximately 18 to 39 individuals, or about one fox per ten square miles. FWS-000202. Sierra Nevada red foxes are likely predominantly monogamous, mating between mid-February and early March, with births occurring in April and early May. *Id.* Sierra Nevada DPS foxes use openings in rock piles and crevices in bedrock as denning sites. *Id.* Their litter sizes are about 2.3 pups on average. *Id.* Sierra Nevada DPS red foxes likely live at least 5.5 years on average, and adult survival rates are about 70% each year. *Id.*

## II. Endangered Species Status and "Not Prudent" Determination for the Sierra Nevada DPS

In 2011, the Service received a petition to list the Sierra Nevada red fox as an endangered or threatened species under the ESA. FWS-003341-419. In 2015, the Service issued a 12-month finding, concluding that two population segments—a segment in the Sierra Nevada mountains and a segment in the Southern Cascades mountains—met the criteria to be designated distinct population segments. 12-Month Finding on a Petition to List Sierra Nevada Red Fox as an Endangered or Threatened Species, 80 Fed. Reg. 60,990 (Oct. 8, 2015); FWS-000009-48. The Service then determined that listing was not warranted for the Southern Cascades DPS but was warranted for the Sierra Nevada DPS. *Id.*

The Service prepared a Species Status Assessment for the Sierra Nevada DPS, evaluating numerous characteristics affecting its viability. FWS-000108-60. Among the environmental characteristics, the Service considered the unique features of the Sierra Nevada DPS's subalpine habitat, which discourages coyotes. FWS-000122. Coyotes compete with red foxes for prey and, at times, kill the foxes or their young. FWS-000122-23. The Service also considered the importance of snowpacks, which the Sierra Nevada DPS relies on for a competitive advantage over coyotes. In addition, the Service evaluated food sources from rodents, rabbits and hares, and whitebark pine. FWS-000123-24. Regarding demographic factors affecting the species' viability, the Service considered the Sierra Nevada DPS's low population size and risk of inbreeding depression. FWS-000124-25. The Sierra Nevada DPS's population was well below the level needed to avoid the risks of inbreeding depression, and below the population size needed to be likely to survive catastrophic events. FWS-000124-26. In addition, while birthrates for the Sierra Nevada DPS were improving, the improvement was the result of the arrival of two non-native male foxes who had produced 11 hybrid pups. FWS-000135. The Service concluded that the current condition of environmental characteristics important to Sierra Nevada DPS viability was generally good, but demographic conditions for the Sierra Nevada DPS were generally poor. FWS-000150.

The Service requested peer review of the Species Status Assessment by five independent

1    reviewers and received responses from two, and the reviewers' feedback was incorporated into

2    the Species Status Assessment. FWS-000207. In addition, the Service received and incorporated

3    comments from other federal agencies, states and state agencies, and tribes.

4        On January 8, 2019, the Service published a proposed rule, proposing to list the Sierra

5    Nevada DPS as an endangered species. Proposed Rule, Endangered Status for the Sierra Nevada

6    Distinct Population Segment of the Sierra Nevada Red Fox ("Proposed Rule"), 85 Fed. Reg. 862

7    (Jan. 8, 2019); FWS-000187-97. The Service also announced that it had determined, based on the

8    best available scientific and commercial information, it was not prudent to designate critical

9    habitat for the Sierra Nevada DPS because the present or threatened destruction, modification, or

10   curtailment of a species' habitat or range was not a threat to the DPS. FWS-000196-97. The

11   Service found that habitat was not a limiting factor for the Sierra Nevada DPS, because there was

12   "abundant, protected adjacent habitat for Sierra Nevada red fox populations to expand into,

13   should their population numbers rebound." FWS-000197. And none of the threats that the Service

14   identified—small population size, hybridization, and competition from coyotes—were related to

15   the present or threatened destruction, modification, or curtailment of the Sierra Nevada DPS's

16   habitat. *Id.* The Service also observed that potential habitat-based stressors facing the Sierra

17   Nevada red fox associated with changing climate, such as reduced snowpack and increased

18   primary productivity, were not expected to affect the species' viability. *Id.* Because the Service

19   did not identify any current or future significant habitat-based threats, and the best available

20   information suggested that the greatest threats to the DPS were associated with small population

21   size and genomic integrity, it would not be prudent to designate critical habitat for the DPS. *Id.*

22   The Service requested comments on the Proposed Rule, including a specific request for

23   comments on "[f]actors that may affect the continued existence of the species, which may include

24   habitat modification or destruction." FWS-000188.

25       On August 3, 2021, the Service issued the Final Rule, listing the Sierra Nevada DPS as an

26   endangered species. FWS-000198-213. The Service did not receive any comments on the "not

27   prudent" determination. In the final rule, it noted its previous conclusion that "the present or

28   threatened destruction, modification, or curtailment of habitat or range is not a threat to the Sierra

1    Nevada DPS, and habitat does not appear to be a limiting factor for the species." FWS-000207.

2    More than three years later, in January 2025, Plaintiff filed this lawsuit challenging the

3    "not prudent" determination for the Sierra Nevada DPS. ECF No. 1.

**STATUTORY BACKGROUND**

5    **I.    The Endangered Species Act**

6    Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon

7    which endangered species and threatened species depend may be conserved, [and] to provide a

8    program for the conservation of such endangered species and threatened species[.]" 16 U.S.C.

9    § 1531(b). If the Service determines that a species is threatened or endangered based on the best

10   scientific and commercial data available, the species is added to the list of threatened and

11   endangered species and subject to a variety of protections under the ESA. *Id.* § 1533(a)(1),

12   (b)(1)(A). For purposes of the ESA, the term "species" includes "species," "subspecies," or "any

13   [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.*

14   § 1532(16).

15   The ESA also requires the Service to designate, "to the maximum extent prudent and

16   determinable[,]" specific geographical areas as "critical habitat" for each listed species. *Id.*

17   § 1533(a)(3)(A). Critical habitat is defined under the ESA as: (i) the specific areas within the

18   geographical area occupied by the species, at the time it is listed . . . on which are found those

19   physical or biological features (I) essential to the conservation of the species and (II) which may

20   require special management considerations or protection; and (ii) specific areas outside the

21   geographical area occupied by the species at the time it is listed . . . upon a determination by the

22   Secretary that such areas are essential for the conservation of the species. *Id.* § 1532(5)(A).

23   The ESA calls for the Service to use its discretion as to whether it is prudent to designate

24   critical habitat for a listed species. *Id.* § 1533(a)(3)(A). The term "prudent" is not defined in the

25   ESA, but in its ordinary meaning at the time the statute was amended to add provisions related to

26   critical habitat, "prudent" means "characterized by, arising from, or showing prudence." *Prudent*,

27   *Webster's Third New Int'l Dictionary* 1828 (unabr. 1976). "Prudence," in turn, means "wisdom

28   shown in the exercise of reason," and "providence in the use of resources." *Prudence*, *Webster's*

*Third New Int'l Dictionary* 1828 (unabr. 1976). Far from a command to the Service to designate critical habitat in every possible case, the ESA commits the determination of whether it is prudent to designate critical habitat to the Service.

To be clear, declining to designate critical habitat does not deprive a listed species of protection under the ESA, including Section 7, which requires agencies to consult with the Service to ensure that any actions they authorize, fund, or carry out are not likely "to jeopardize the continued existence of any endangered species or threatened species[.]" 16 U.S.C. § 1536(a)(2). Nor does designating critical habitat provide a refuge or other protected place for a species. FWS-000196 (Proposed Rule, 85 Fed. Reg. at 871). When an area is designated as critical habitat, it receives protection under Section 7 through the requirement that federal agencies consult with the Service to ensure that such actions are not likely to "result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). However, the designation of critical habitat "does not . . . establish a refuge, wilderness, reserve, preserve, or other conservation area . . . [nor does it] require implementation of restoration, recovery, or enhancement measures[.]" FWS-000196.

## II.    Implementing Regulations on Criteria for Designating Critical Habitat

In the ESA implementing regulations, the Service has set out a non-exhaustive list of examples of situations in which the Service may determine that designating critical habitat would not be prudent. *See* 50 C.F.R. § 424.12(a)(1). At the time relevant to the listing of the Sierra Nevada DPS of the Sierra Nevada Red Fox, the rule provided:

> (1)    The Secretary may, but is not required to, determine that a designation would not be prudent in the following circumstances:
>
>> (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;
>>
>> (ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;
>>
>> (iii) Areas within the jurisdiction of the United States provide no

more than negligible conservation value, if any, for a species
occurring primarily outside the jurisdiction of the United States;

(iv) No areas meet the definition of critical habitat; or

(v) The Secretary otherwise determines that designation of critical
habitat would not be prudent based on the best scientific data
available.

50 C.F.R. § 424.12(a)(1) (2020); *accord* Regulations for Listing Species and Designating Critical

Habitat, 84 Fed. Reg. 45,020, 45,053 (Aug. 27, 2019).

In 2024, the non-exhaustive list was updated as follows:

(1)    Designation of critical habitat may not be prudent in circumstances such
as, but not limited to, the following:

(i) The species is threatened by taking or other human activity and
identification of critical habitat can be expected to increase the
degree of such threat to the species;

(ii) The present or threatened destruction, modification, or
curtailment of a species' habitat or range is not a threat to the
species;

(iii) Areas within the jurisdiction of the United States provide no
more than negligible conservation value, if any, for a species
occurring primarily outside the jurisdiction of the United States; or

(iv) No areas meet the definition of critical habitat.

50 C.F.R. § 424.12(a)(1) (2025); *accord* 89 Fed. Reg. 24,300, 24,335 (Apr. 5, 2024).

## STANDARD OF REVIEW

Plaintiff's challenges to the Service's compliance with the ESA are subject to the judicial

review standards of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. *San Luis &*

*Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the

Service's final decisions must be upheld unless they are found to be "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope

of review" is "narrow and a court is not to substitute its judgment for that of the agency." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court's task

"is to determine whether the [agency] has considered the relevant factors and articulated a

Defendant's Mem. in Support of Cross-Motion for Summary Judgment and Motion
to Stay or Remand and Opposition to Plaintiff's Motion for Summary Judgment

8

1    rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat.*

2    *Res. Def. Council*, 462 U.S. 87, 105-06 (1983) (citation omitted).

3        Judicial review of federal agency actions under the APA is exceedingly deferential. *Lands*

4    *Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008) (en banc) (emphasizing the court's

5    limited role in reviewing agency actions under the APA), *overruled in part on other grounds by*

6    *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). Under this deferential standard, "[a]n agency

7    will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the

8    agency] made a clear error in judgment.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d

9    1113, 1124 (9th Cir. 2012) (quoting *McNair*, 537 F.3d at 994). "While we may not supply a

10    reasoned basis for the agency's action that the agency itself has not given, we will uphold a

11    decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman*

12    *Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation omitted);

13    *Jewell*, 747 F.3d at 616 (same); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir.

14    1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no

15    rational basis for the action." (citation omitted)).

16        Courts give heightened deference to agencies' determinations in areas of their expertise.

17    They are "to be most deferential when the agency is making predictions, within its area of special

18    expertise, at the frontiers of science[, and] . . . we are to conduct a particularly deferential review

19    of an agency's predictive judgments about areas that are within the agency's field of discretion

20    and expertise . . . as long as they are reasonable." *McNair*, 537 F.3d at 993 (citation modified);

21    *see also Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, No. 24-4542, 2025 WL 2460946, at

22    *26 (9th Cir. Aug. 27, 2025) ("In essence, the Plaintiffs challenge BLM's conclusions about the

23    severity and existence of deleterious edge effects. This is a technical, scientific issue where

24    deference to agency technical expertise is at its apogee."). "We may not impose ourselves 'as a

25    panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders

26    the agency to explain every possible scientific uncertainty.'" *TriValley CAREs*, 671 F.3d at 1124

27    (quoting *McNair*, 537 F.3d at 988).

28        Plaintiff also presents a facial challenge to a regulation. "To prevail in such a facial

1  challenge, [plaintiff] 'must establish that no set of circumstances exists under which the

2  [regulation] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v.*

3  *Salerno*, 481 U.S. 739, 745 (1987)); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty.*

4  *v. Zinke*, 889 F.3d 584, 599 (9th Cir. 2018) (applying "no set of circumstances" test to facial

5  challenge to agency regulation); *cf. Wash. State Grange v. Wash. State Republican Party*, 552

6  U.S. 442, 450 (2008) (explaining facial challenges are disfavored because of risk of premature

7  interpretation based on speculation rather than in the context of actual disputes).

8                                    **ARGUMENT**

9  **I.    The Court Should Stay Plaintiff's Facial Challenge to the "Not Prudent" Regulation
        or, in the Alternative, Remand the Regulation to the Service Without Vacatur**

10          As explained at the outset of this Memorandum, the Services are reconsidering the Section

11  4 regulations. A proposed rule is planned to be sent to the Office of the Federal Register about

12  four months before this case is set for a hearing. And, by the time the Court hears these motions,

13  the rule should be just half a year away from finalization. The new rulemaking will moot or, at a

14  minimum, substantially alter the dispute in this case. The Service therefore respectfully requests

15  that the Court stay Plaintiff's facial challenge to the "not prudent" regulation during the pendency

16  of the rulemaking. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (the power to stay is

17  "incidental to the power inherent in every court to control the disposition of the causes on its

18  docket"); *see also Nat'l Hydropower Ass'n*, 2025 WL 1555156.

19          In the alternative, the Court could remand the challenged regulation to the Service without

20  vacatur. Agencies have inherent authority to reconsider past decisions and to revise, replace, or

21  repeal a decision to the extent permitted by law and supported by reasoned explanation. *FCC v.*

22  *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency proposes to reconsider

23  its decision, an agency's voluntary remand request should be granted "unless the request is

24  frivolous or made in bad faith." *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 60 (9th Cir. 2022)

25  (citation omitted); *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("We commonly

26  grant [agency remand] motions, preferring to allow agencies to cure their own mistakes rather

27  than wasting the courts' and the parties' resources reviewing a record that both sides

28

acknowledge to be incorrect or incomplete."). This is so even if the agencies do not "conced[e] any error in the underlying proceedings." *Li v. Keisler*, 505 F.3d 913, 916 (9th Cir. 2007). Clearly, a revision of the Section 4 implementing regulations is already underway, and therefore voluntary remand of the "not prudent" regulation would be an appropriate alternative to a stay.

## II.    The "Not Prudent" Rule Is Valid on Its Face

Section 1533(a)(3) of the Act requires that, "to the maximum extent prudent and determinable," the Services will designate a species' critical habitat concurrently with listing the species. The statute does not define or further clarify the term "prudent." In 2024, the Services revised 50 C.F.R. § 424.12(a)(1) to provide a non-exhaustive list of specific scenarios where the Services may, but are not required to, find it is not prudent to designate critical habitat in a future decision on a particular species.

The 2019 and 2024 regulations marked a change from the pre-2019 regulation that set forth several scenarios where critical habitat may not be prudent. That pre-2019 version allowed for a determination that critical habitat is not prudent for a species if such designation would: (1) increase the degree of threat to the species through the identification of critical habitat, or (2) "not be beneficial to the species," listing several non-exhaustive factors the Services could consider in determining whether a designation would not be beneficial. 81 Fed. Reg. 7,414, 7,425 (Feb. 11, 2016). Subsequently, the Services determined that the second circumstance of "would not be beneficial to the species" was "difficult to understand and apply." 83 Fed. Reg. 35193, 35197 (July 25, 2018); 89 Fed. Reg. at 24,318 (noting difficulty in applying the "not beneficial" standard). The Services thus modified subsection 424.12(a)(1) to set forth a non-exhaustive list of scenarios in which the Services might find it not prudent to designate critical habitat as contemplated in ESA Section 4(a)(3)(A). The Services explained that they preferred to base "not-prudent determinations on whether particular circumstances are present, rather than on whether a designation would not be 'beneficial'" because their new interpretation is "clearer, more transparent, and more straightforward." 89 Fed. Reg. at 24,318; 83 Fed. Reg. at 35,197 (explaining preference for stating particular circumstances rather than a broad test); 84 Fed. Reg.

1    at 45,040 (same).

2         Plaintiff argues that the "not prudent" regulation is unlawful because, first, the statute's

3    use of the term "maximum extent" in section 1533(a)(3) manifests an intent by Congress for the

4    "not prudent" exception to be construed narrowly. In fact, the plain text of ESA Section

5    4(a)(3)(A) shows that Congress instead conferred discretion on the Services to use their judgment

6    and discretion, as shown by its choice of the word "prudent." This term is used in many contexts,

7    statutes, and common law to convey discretion. *E.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197

8    (9th Cir. 2016) (en banc) (duty of prudent investment in trust law requires "exercising reasonable

9    care, skill, and caution."). And it is commonly understood to mean "well thought out;

10   thoughtfully planned or cautiously considered." Black's Law Dictionary (12th ed. 2024). The

11   definition from the time of the ESA amendment used a similar definition for prudence, namely,

12   "wisdom shown in the exercise of reason," and "providence in the use of resources." *Prudence*,

13   *Webster's Third New Int'l Dictionary* 1828 (unabr. 1976).  Such a broad term necessarily confers

14   discretion on the Services "to determine the circumstances when designating critical habitat may

15   not be prudent." 89 Fed. Reg. at 24317. Plaintiff cites *Natural Resources Defense Council v. U.S.*

16   *Department of the Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997). ECF No. 27-1 at 16. But, in that

17   case, the actual holding was not that Congressional intent requires "not prudent" findings to be

18   rare, but that the Service deviated from both its own regulations and the intent of the ESA in

19   declining to designate critical habitat for a species where the designation would benefit a large

20   portion of the species' habitat. *Nat. Res. Def. Council*, 113 F.3d at 1126.

21        Second, Plaintiff argues that a "critical habitat designation is required whenever it would

22   provide a conservation benefit" and endorses a reading of the statute that would require the

23   Service to perform a cost-benefit analysis under ESA section 4(b)(2). ECF No. 27-1 at 17-18. In

24   support, Plaintiff cites to *Nat. Res. Def. Council*, 113 F.3d at 1125, *Conservation Council for*

25   *Haw. v. Babbitt*, 2 F. Supp. 2d 1280, 1285 (D. Haw. 1998), and *Center for Biological Diversity v.*

26   *U.S. Fish and Wildlife Service*, No. 22-cv-1877-RDM, 2025 U.S. Dist. LEXIS 132666, at *31

27   (D.D.C. July 11, 2025). Yet, those cases and Plaintiff's endorsement of a critical habitat

28   determination anywhere the determination would confer a "benefit" to the species appears to be at

odds with the Ninth Circuit's holding *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 67 F.4th 1027, 1037-38 (9th Cir. 2023). There, the Ninth Circuit held that the ESA requires the Service to show that designating critical habitat is more than beneficial—it must be necessary or indispensable to conservation.[3] 67 F.4th at 1038. Moreover, any balancing of costs and benefits, as contemplated in section 4(b)(2) of the ESA, occurs after the critical habitat designation, not before. *Id.* at 1050. Thus, the Ninth Circuit has made clear, the appropriate place for weighing the benefits to a species from a critical habitat designation occurs after the Service has determined that designation is both prudent and determinable, not as part of the prudency determination in the first instance.

Third, Plaintiff argues that the purpose and legislative history of the ESA requires the Service to designate critical habitat anywhere it might confer a benefit. Undeniably, the purpose of the ESA is the conservation of species. 16 U.S.C. § 1531(b). But purpose cannot override clear statutory language. As explained above, the plain language of the ESA necessarily confers discretion on the Services "to determine the circumstances when designating critical habitat may not be prudent. Furthermore, "legislative history is not the law." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

In sum, Plaintiff has pointed to nothing suggesting that it was invalid for the Services to provide a non-exhaustive list of specific scenarios where the Services may, but are not required to, find it is not prudent to designate critical habitat in a future decision on a particular species. 50 C.F.R. § 424.12(a)(1). To the contrary, the statute's use of the word "prudent" demonstrates legislative intent to confer discretion on the Service.

## III.  Plaintiff Waived Any Challenge to the "Not Prudent" Determination by Not Raising It During Notice-and-Comment Rulemaking

Turning to Plaintiff's claims about the specific "not prudent" determination for the Sierra

---

[3] *Center for Biological Diversity* also distinguished between the standards for occupied and unoccupied areas, but, as relevant here, the cornerstone question for the Service is whether the designation of critical habitat is essential. *See* 67 F.4th 1027, 1041 (citing *Bear Valley Mut. Water Co. v. Salazar*, No. SACV 11–01263–JVS, 2012 WL 5353353, at *22 (C.D. Cal. Oct. 17, 2012), *aff'd sub nom. Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015)).

Nevada DPS, plaintiff waived those claims by not asserting them in the administrative process. Under the doctrine of administrative waiver, "absent exceptional circumstances, failure to raise arguments before an agency, such as in comments during a public-comment process, usually waives a litigant's rights to make those arguments in court." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 487-88 (9th Cir. 2023); *Univ. Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004) (quoting *Exxon Mobil v. U.S. EPA*, 217 F.3d 1246 (9th Cir. 2000) ("Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review."); *see also Sims v. Apfel*, 530 U.S. 103, 112 (2000) (O'Connor, J., concurring) (noting the Supreme Court is unanimous that "an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court"). A court may "consider any issue that was raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Waterkeeper All. v. U.S. EPA*, 140 F. 4th 1193, 1212 (9th Cir. 2025) (citation omitted).

Here, Plaintiff did not raise any comment on the "not prudent" determination in the Proposed Rule. *See* FWS-000207-10; FWS-001256-70 (Plaintiff's comments). It appears that one commenter mentioned the "not prudent" determination, but that individual commented that the proposed rule should be published as a final rule. FWS-001241. Plaintiff's failure to raise its concerns during the notice-and-comment process left the agency without an opportunity to respond to or otherwise address the issue in the Final Rule. Thus, as an initial matter, the Court should decline to hear Plaintiff's arguments as a matter of administrative waiver. *See All. for the Wild Rockies*, 68 F.4th at 487-88.

## IV.    The Service's Determination That Designating Critical Habitat Was Not Prudent Is Rational and Complies with the ESA and Its Implementing Regulations

The Service's determination that it was not prudent to designate critical habitat for the Sierra Nevada red fox was a rational choice based on the Service's thorough analysis of the threats and other stressors facing the species. The Service correctly applied its own regulation in

1    determining that "the present or threatened destruction, modification, or curtailment of habitat or

2    range is not a threat to the Sierra Nevada DPS." FWS-000207; *see* 50 C.F.R. § 424.12(a)(1)

3    (2020). None of the threats to the species' viability are based on the present or threatened

4    destruction, modification, or curtailment of its habitat or range. FWS-000203. Instead, threats to

5    the DPS are rooted in its low population numbers. FWS-000204. Low population numbers mean

6    that a catastrophic event might cause the loss of a large proportion of the population. FWS-

7    000206. Low population numbers also lead to inbreeding depression, which is caused by the

8    chance loss of beneficial gene variants. *Id.* This can result in lowered reproductive ability,

9    congenital defects, and lowered disease resistance. *Id.* In the case of the Sierra Nevada DPS, it

10   affected reproductive ability, and only hybrid Sierra Nevada red foxes were born between 2011

11   and 2017. Although the census population of the red fox was between 18 to 39 individuals, its

12   effective population (the number of breeding individuals) was just six, until two non-native male

13   foxes joined the population in 2012. *Id.* This event might have lessened some effects of

14   inbreeding depression by increasing reproductive success, but it also led to the birth of 11 hybrid

15   pups in the first year and 24 total hybrid pups between 2013 and 2017. *Id.* Over time, through

16   hybridization, the unique characteristics of the Sierra Nevada DPS may be lost. *Id.*

17       The Service explicitly considered all risk factors to the species, including environmental

18   and demographic characteristics but found that "the available information does not show that any

19   environmental risk factors are currently threatening the DPS's viability." FWS-000207. By

20   contrast, the Service found that several demographic risk factors were threatening the viability of

21   the DPS, namely small population size and interbreeding with nonnative foxes. *Id.*

22       The Service also found there is abundant, protected habitat into which the Sierra Nevada

23   red fox can expand, if its population numbers rebound, and habitat is not a limiting factor for the

24   species. FWS-000197. In terms of abundance, the Sierra Nevada DPS's habitat in the crest of the

25   Sierra Nevada mountains coincides with numerous national forests and national park lands. Even

26   in its current range, the Sierra Nevada DPS is at a tenth of its former population density.

27   FWS-000118, FWS-000202. There is no shortage of abundant, high-quality habitat for the Sierra

28   Nevada DPS.

Though the Service discussed another environmental stressor, namely coyote presence, within the context of habitat suitability and snowpack levels, FWS-000205, the Service ultimately concluded that there was not sufficient information to conclude that increased coyote numbers in the Sierra Nevada DPS's range were a threat to viability. FWS-000207. Moreover, the best available scientific and commercial information suggested that the areas where the Sierra Nevada DPS occur have maintained high snowpack during winter and spring (which may limit coyote encroachment). FWS-000205. Furthermore, even with increased competition from coyotes, the Sierra Nevada DPS had adequate prey. *Id.*

The Service concluded that none of these threats—small population size, hybridization, competition with coyotes—"fall in the category of present or threatened destruction, modification, or curtailments of the fox's habitat." FWS-000197. Thus, the Service rationally, and consistent with its own regulations, determined under its regulations that it was "not prudent" to designate critical habitat for the Sierra Nevada DPS. FWS-000207; *see* 50 C.F.R. § 424.12(a)(1) (2020). That rational determination is entitled to deference. *Balt. Gas & Elec. Co.*, 462 U.S. at 105; *McNair*, 537 F.3d at 992-94.

**V.    The Service Lawfully Applied Its "Not Prudent" Regulation**

Plaintiff next argues that the Service did not properly apply its "not prudent" regulation because, in the Proposed Rule, the Service made two references to considering whether habitat destruction was a "significant" threat and whether there were significant "habitat-based" threats. FWS-000197. ECF No. 27-1 at 23-24. First, Plaintiff overlooks that, in the Final Rule, the Service expressly concluded that "the present or threatened destruction, modification, or curtailment" of habitat or range is not a threat to the Sierra Nevada red fox." FWS-000196-97 (emphasis added).

Second, Plaintiff's argument about "habitat-based" threats is an oversimplification of what the Service considered in concluding that the "present or threatened destruction, modification, or curtailment of its habitat or range" was not a threat to the Sierra Nevada DPS. That language was imported from the ESA's listing criteria. *Compare* 16 U.S.C. § 1533(a)(1)(A), *with* 50 C.F.R. § 424.12(a)(1) (2020). In the listing context, this is called "Factor A." *See* 16 U.S.C.

1  § 1533(a)(1)(A). As relevant here, the ESA listing criteria also call for consideration of "other

2  natural or manmade factors" affecting the species' existence. *Id.* § 1533(a)(1)(E). These other

3  factors are considered under "Factor E."

4           A species may face threats that in some way relate to its habitat that do not arise from the

5  destruction, modification, or curtailment of its habitat. In most cases, those are considered "Factor

6  E" factors. For example, in listing decisions, the Service considers the impacts of climate change

7  or the availability of food sources as "other natural or manmade factor[s]" where they do not

8  necessarily represent destruction, modification, or curtailment of habitat, but may nonetheless

9  have an effect on a species and its habitat. *See, e.g.*, *Ctr. for Biological Diversity v. Zinke*, 900

10  F.3d 1053, 1061 (9th Cir. 2018) (Service evaluated effects of climate change as an "other natural

11  or manmade factor" in case involving arctic grayling); *Greater Yellowstone Coal., Inc. v.*

12  *Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011) (Service evaluated whitebark pinenut production

13  and stresses on whitebark pine, a food source for grizzlies, as other natural or manmade factors).

14  The Service did the same here. In the listing portion of its decision, which Plaintiff does not

15  challenge, it expressly evaluated competition with coyotes resulting from reduced snowpack

16  levels as "other natural and manmade factors." FWS-000202-03. It would be incongruous for the

17  Service to consider those same conditions as destruction, modification, or curtailment of habitat

18  in the prudency determination. Simply because the Service evaluated threats and stressors that are

19  in some way related to the species' habitat does not mean that the species was necessarily

20  threatened by the "present or threatened destruction, modification, or curtailment of a species'

21  habitat or range." 50 C.F.R. § 424.12(a)(1) (2020). To the contrary, here, the Service concluded

22  that the Sierra Nevada DPS has abundant habitat and adequate prey availability. FWS-000197,

23  FWS-000205.

## VI.    Plaintiff's Argument that the Service Overlooked Threats from Snowmobiles and Livestock Grazing Are Unfounded

26         Plaintiff's arguments that the Service overlooked certain habitat-based threats to the Sierra

27  Nevada DPS are misplaced. Plaintiff argues that the Service overlooked potential impacts from

28  snowmobiling on public lands and livestock grazing on public lands, within the range of the

1    Sierra Nevada DPS, and that those activities pose threats to the Sierra Nevada DPS that the

2    Service did not consider. As an initial matter, each of those activities are actions either authorized

3    or carried out by federal agencies and are covered by Section 7's consultation requirement. The

4    U.S. Forest Service (which manages snowmobiling and grazing allotments in the area where the

5    Sierra Nevada DPS occurs) are obligated to consult with the Service to ensure that the actions

6    they authorize, fund, or carry out are not likely "to jeopardize the continued existence of any

7    endangered species or threatened species[.]" 16 U.S.C. § 1536(a)(2). Thus, the effect of those

8    activities on the Sierra Nevada DPS would be considered during Section 7 consultation. Likewise,

9    the species is also protected from take under Section 9 of the ESA. *Id.* § 1538(a)(1); *see*

10   FWS-000212. In addition, the Sierra Nevada red fox has long been considered a sensitive species

11   in the National Forests within California. FWS-000147. Thus, the Sierra Nevada DPS has

12   numerous protections on federal lands.

13          Furthermore, as explained below, the Service considered the potential impacts of

14   snowmobiling and livestock grazing in determining that "the present or threatened destruction,

15   modification, or curtailment of a species' habitat or range is not a threat to the species." *See* 50

16   C.F.R. § 424.12(a)(1) (2020). The Service then made a rational determination not to designate

17   critical habitat for the Sierra Nevada red fox after considering those potential impacts.

18          **A.    The Service rationally determined that potential habitat impacts associated**
19          **with snowmobiling were not a threat to the Sierra Nevada DPS.**

20          Plaintiff argues that the Service overlooked potential impacts from snowmobiling and

21   stresses that the Service should have considered impacts from snowmobiling as it relates to

22   critical habitat, not the species. ECF No. 27-1 at 24-26. But, considering impacts to habitat alone

23   would be inconsistent with the Service's regulation. The "not prudent" regulation specifically

24   provides that an action may not be prudent where "the present or threatened destruction,

25   modification, or curtailment of a species' habitat or range is not a threat to the species." 50 C.F.R.

26   § 424.12(a)(1) (emphasis added). In any event, the Service considered potential impacts from

27   snowmobiling throughout the listing process and, as explained below, reached the rational

28   conclusion that the species did not warrant listing because of impacts associated with

1 snowmobiling.

2       In 2009, Congress formally established the Bridgeport Winter Recreation Area

3 ("BWRA"), Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, § 1806, 123

4 Stat. 1059 (2009) (codified at 16 U.S.C. § 460vvv); FWS-011382-83. The BWRA, a 7,000-acre

5 area within the Humboldt-Toiyabe National Forest, is a designated area for winter motorized

6 recreation and is managed in accordance with the 2010 BWRA management plan.

7 FWS-018776-823. At the time of the listing decision, snowmobiling was also permitted nearby

8 along State Road 108 in the Humboldt-Toiyabe National Forest and in semi-primitive areas to the

9 northwest of the BWRA. FWS-000131-32 (citing FWS-012975). The Service evaluated

10 snowmobiling as a potential stressor to the Sierra Nevada DPS, based in part on literature

11 indicating that compaction of snow by snowmobiles could potentially affect rodents burrowing

12 below the snow. FWS-000123, FWS-000131. In addition, the Service considered that

13 snowmobile trails could allow coyotes easier access into higher elevations that might otherwise

14 be impassable due to deep snow. FWS-000131. Thus, snowmobiles pose two potential (and

15 interrelated) threats: reduced prey availability, and increased competition for rodent prey from

16 coyotes.

17       The Service addressed these potential stressors in the Species Status Assessment and the

18 Final Rule. First, the Service noted that "the general landscape appears adequate for rodents."

19 FWS-000205. White-tailed jackrabbits and snowshoe hares remain common and present

20 year-round in the Sonora Pass area, and the Sierra Nevada DPS is uniquely positioned to

21 outcompete coyotes for that prey during colder months. FWS-000132. The Service acknowledged

22 some downward trends in white-tailed jackrabbit and snowshoe hare populations throughout the

23 Sierra Nevada mountains, but those populations appear to be sufficient for the Sierra Nevada

24 DPS. FWS-000132-33, FWS-000205. In fact, rather than facing a shortage of prey, the Sierra

25 Nevada DPS's access to rodents has increased because of increased primary productivity in the

26 subalpine habitat. FWS-000205. This increased access to prey has occurred notwithstanding the

27 Sierra Nevada DPS's increased competition with coyotes. *Id.*

28       In addition to the Service's analysis that prey availability was not a threat to the species,

the U.S. Forest Service provided additional information during peer and partner review of the Species Status Assessment about the average daily use in snowmobile recreational areas. In winters from 2011 to 2017, the BWRA averaged just five snowmobile permits per day during seasons lasting an average of about 112 days. FWS-000891. The U.S. Forest Service also pointed out that the BWRA is known for high-powder conditions, technical terrain, and low densities of users, where snowmobilers do not have to follow established trails that might result in more compacted snow. *Id.* In the Final Rule, the Service concluded that this additional information provided by the U.S. Forest Service indicated that recreational snowmobiling in the BWRA was unlikely to have population-level impacts on the Sierra Nevada DPS. FWS-000208.

In fact, repeatedly, in the Final Rule, the Service explained that the best available scientific and commercial information indicated that snowmobiling and its potential to compact snow—either resulting in loss of prey or in increased access to subalpine areas for coyotes—was not a risk factor for the Sierra Nevada DPS. FWS-000208-09. The Service also pointed out that it anticipated consulting with other federal agencies on proposed actions with respect to snowmobiling in order to ensure that the species is not jeopardized by federal action. FWS-000209 (citing 16 U.S.C. § 1636(a)(2)).

The record supports the Service's finding that the species should not be listed based on the present or threatened destruction, modification, or curtailment of the species' habitat or range, notwithstanding the fact that snowmobiling occurs within the Sierra Nevada DPS's range. The Service did not overlook the potential impacts of snowmobiling but, instead, considered those impacts throughout the process of listing the Sierra Nevada DPS and determining that it would not be prudent to designate critical habitat for the species. Considering the Service's analysis that the Sierra Nevada DPS was not threatened by lack of prey availability, even accounting for increased competition with coyotes, and the information provided by the U.S. Forest Service that there were on average only five snowmobilers each day in the entire 7,000-acre BWRA, the Service rationally determined that the best available scientific and commercial information indicated snowmobiling was not a threat to the Sierra Nevada DPS.

Defendant's Mem. in Support of Cross-Motion for Summary Judgment and Motion
to Stay or Remand and Opposition to Plaintiff's Motion for Summary Judgment

20

**B.    The Service rationally determined that potential habitat impacts associated with livestock grazing were not a threat to the Sierra Nevada DPS.**

The Service appropriately determined that livestock grazing was not a threat to the Sierra Nevada red fox. The Service first considered the potential impacts of grazing on the Sierra Nevada red fox in a species report the Service prepared in connection with the 12-month finding in 2015 which found that listing the Sierra Nevada red fox was warranted. *See* FWS-020039-116. The Service reached this conclusion through careful consideration of scientific literature, and incorporated analysis from a 2015 species report prepared in connection with the 12-month finding, which concluded there were "low or no impacts, overall, across the subspecies' range" from livestock grazing. FWS-000016. And this makes sense, because as explained more fully below, the record reflects that currently there are very few grazing allotments that overlap with Sierra Nevada red fox habitat. *See*, FWS-004231-43, FWS-004250-63 (listing elevations of meadows within the Summit ranger district, most of which are well below 8,100 feet in elevation). Furthermore, there were no direct impacts from grazing on the Sierra Nevada DPS's prey base. FWS-000203 (noting importance of prey availability to Sierra Nevada DPS's resiliency).

Historically, livestock grazing was considered a threat to the Sierra Nevada red fox both because of overgrazing by sheep and because of the use of strychnine for predator control,[4] which has now been outlawed except in public recreation areas, to prevent plague outbreaks. FWS-020068. Grazing in montane meadows no longer occurs at the intensity experienced in the past. FWS-012168. The Service also reviewed literature about the impacts of grazing on prey abundance, including studies indicating that grazing could potentially lower the abundance of prey species by altering their habitat. FWS-020068. Inappropriately managed and excessive livestock grazing can compact soil in meadows, reducing water infiltration rates during storm events and lowering the water table, converting meadows into dry flats. *Id.* As a more direct impact, livestock can consume forage that might otherwise be consumed by prey species. *Id.*

---

[4] Plaintiff asserts that grazing caused the decline of the Sierra Nevada DPS in the 1900s, citing Perrine 2010 (ECF 27-1 at 8). Perrine's assessment noted those findings were uncertain, however. FWS-012156 (commenting that grazing was "likely" or "probably" a source of decline).

1    However, the Service also considered literature indicating that grazing practices may also

2    increase important rodent prey populations, particularly populations of pocket gophers, which is

3    an important prey species for montane foxes in general and an important prey species for the

4    Sierra Nevada red fox. FWS-020068, FWS-012163, FWS-012168.

5         In addition to the literature and historical impacts of grazing, the Service also considered

6    the impacts of existing grazing allotments managed on U.S. Forest Service lands in areas near the

7    Sierra Nevada DPS. There are federal grazing allotments within two U.S. Forest Service districts

8    near the location of the Sierra Nevada DPS: the Summit ranger district and the Bridgeport ranger

9    district. FWS-020069. When the 12-month finding was published, the Service had information

10   about grazing allotments in only one ranger district, the Summit district.[5] *Id.* Of those allotments,

11   a relatively small proportion of the acreage was potentially suitable for Sierra Nevada red fox use.

12   *Id.* Specifically, there were three allotments[6] totaling 48,200 acres within the Summit ranger

13   district containing habitat that might be suitable for Sierra Nevada red fox use, and, within that

14   acreage, only about 17,911 acres, or, about a third, were thought to contain potentially suitable for

15   the Sierra Nevada DPS. FWS-020069, FWS-019221. In other words, for the allotments managed

16   by the U.S. Forest Service for which substantive information was available, only a fraction of the

17   allotments near the Sierra Nevada DPS contain potentially suitable habitat for the Sierra Nevada

18   DPS, and only a fraction of the meadows within those select few allotments have potentially

19   suitable habitat for the Sierra Nevada DPS. This is because relatively few grazing meadows are

20   found at elevations greater than 8,100 feet. *E.g.*, FWS-004231-43, FWS-004250-63.

21

22   [5] The Service also issued a data call for data about the Bridgeport range district allotments. FWS-
     002001. The Service did not receive reports about environmental conditions at the Bridgeport
23   allotments of the same quality as the Central Sierra Environmental Resource Center ("CSERC")
     report on the Summit allotments, but it did receive logs indicating that three relevant Bridgeport
24   allotments were used for sheep grazing (Silver Creek, Poison Creek, and Piute) and one was used
     for cattle grazing of only 125 head of cattle or 125 cow-calf pairs (Sardine). FWS-002001,
25   FWS-015229, FWS-015225-28, FWS-008977. The grazing meadows for which monitoring logs
     existed showed compliance with U.S. Forest Service permits. FWS-013635-66. The boundaries of
26   the Humboldt Toiyabe National Forest allotments are available at FWS-012912.

27   [6] The three relevant allotments in the Summit ranger district are Bell Meadow, Eagle Meadow,
     and Herring Creek. The general boundaries of those allotments as of 2014 are available at
28   FWS-008383.

In addition, in its 2015 report supporting the 12-month finding, the Service evaluated a status report for meadows in the Stanislaus National Forest prepared by an independent organization, the CSERC. FWS-020070 (citing FWS-004226). Although the report noted there were some impacts to hydrology and vegetation associated with overgrazing, some meadows had no negative impacts. FWS-020070. There was also no evidence of direct impacts to the Sierra Nevada DPS prey base. *Id.* Thus, based on the best available data, the Service concluded grazing was not a stressor for the Sierra Nevada red fox. *Id.*

Though Plaintiff argues that the Service failed account for livestock grazing as a threat to the Sierra Nevada DPS, ECF No. 27-1 at 26-29, that is clearly belied by the administrative record. *See Bowman Transp., Inc.*, 419 U.S. at 285-86 ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). The Service addressed concerns about grazing again in the Final Listing Rule. The Service addressed a public comment that the Sierra Nevada DPS is threatened by farming of livestock. FWS-000209. The Service explained that it had previously addressed livestock grazing as a potential threat in its 12-month finding, and that the agency had concluded that the best available scientific and commercial information indicates that livestock grazing had relatively low potential for impact because Sierra Nevada DPS foxes typically occur at elevations above those used for grazing. *Id.* This is far from arbitrary, as Plaintiff alleges, because as explained above there is ample record support for the Service's conclusions.

Plaintiff argues there is an overlap between the altitudes of certain grazing meadows and the altitudes frequented by the Sierra Nevada red fox, but Plaintiff cites no evidence undermining the Service's conclusion that livestock grazing had relatively low potential for impact because, except for a small number of allotments, Sierra Nevada DPS foxes typically occur at elevations above those used for grazing. The Service's conclusion was both rational and well supported by record evidence. In the 2012 CSERC report on meadow conditions in the Stanislaus National Forest, only five individual meadows evaluated by CSERC in the Summit ranger district were at or above 8,1000 feet in elevation (the lowest elevation frequented by the Sierra Nevada DPS), and

1    only three of those meadows had been grazed that year. FWS-004231-43, FWS-004250-63. Not

2    one of those meadows was above 9,000 feet. *Id.* According to data made available to the Service

3    in 2020, fewer than 3% of Sierra Nevada red fox genetic detections occur below 9,000 feet.

4    FWS-012378. Based on the best available, most up-to-date data, there is simply very little overlap

5    between the subalpine habitat of the Sierra Nevada red fox and federal grazing lands. *See*

6    FWS-000209. And, even if in very limited circumstances there is overlap, the Service considered

7    the impacts of grazing on the Sierra Nevada DPS's prey base and determined there is no

8    real-world evidence of decreased prey availability associated with present-day grazing practices.

9    FWS-020070.

10        In sum, early in listing process, the Service considered the impacts of grazing on the

11    Sierra Nevada red fox and concluded that there were "low or no impacts, overall, across the

12    subspecies' range" from livestock grazing. FWS-000016. There was no requirement for the

13    Service to provide more detail in the final rule when that issue had been thoroughly evaluated for

14    the 12-month finding.

15                                    **REMEDY**

16        On the question of remedy, the Service respectfully submits that Plaintiff is not entitled to

17    any relief. In the event that the Court does not grant Defendant's motion for summary judgment,

18    the Service respectfully requests an opportunity to brief any remedy.

19        And, for the reasons stated *supra*, in section I of the Argument, the court should stay

20    Plaintiff's facial challenge to the "not prudent" regulation pending the upcoming rulemaking, or,

21    in the alternative, remand the regulation to the Service without vacatur.

22        As a further note on remedy, the apparent upshot of Plaintiff challenging the "not prudent"

23    determination for the Sierra Nevada DPS and the facial challenge in the same lawsuit is an

24    attempt to vacate both the Sierra Nevada DPS "not prudent" determination and the "not prudent"

25    regulation at the same time so that "the pre-2019 version of the Not Prudent Regulation . . .

26    appl[ies] pending remand." ECF No. 27-1 at 29. Vacatur cannot be an end run around the

27    principle that, in APA cases, "a reviewing court is not generally empowered to conduct a de novo

28    inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry,

the proper course of action where the record before the agency does not support the relevant

agency action is to remand to the agency for additional investigation and explanation." *UOP v.*

*United States*, 99 F.3d 344, 351 (9th Cir. 1996) (citation omitted). In the event of remand, the law

to be applied on remand will be a question for the Service to consider in the first instance.

### CONCLUSION

For the reasons set forth above and based on the materials in the administrative record, the

Service's determination that designating critical habitat for Sierra Nevada DPS is not prudent is

rational, based on the best available scientific and commercial data, and fully complies with the

ESA and its implementing regulations. Furthermore, the Court should stay or remand without

vacatur Plaintiff's challenge to the "not prudent" regulation. The Court should deny Plaintiff's

motion for summary judgment and grant Defendant's cross-motion for summary judgment.


Dated: September 26, 2025.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH L. FLAX, Deputy Section Chief
NICOLE M. SMITH, Assistant Section Chief

*/s/ Sara M. Warren*
SARA M. WARREN, Trial Attorney
(GA Bar 966948)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 598-5785
Fax | (202) 305-0275
Sara.Warren@usdoj.gov

*Attorneys for Defendant*