ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH L. FLAX, Deputy Section Chief
NICOLE M. SMITH, Assistant Section Chief

SARA M. WARREN, Trial Attorney (GA Bar No. 966948)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 598-5785
Fax | (202) 305-0275
E-mail: Sara.Warren@usdoj.gov

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br><br>Defendant. | Case No. 2:45-cv-00045-DAD-CKD<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY** |

Pursuant to Local Rule 230(m)(2), Defendant notifies the Court of a recent decision of the Northern District of California relevant to Plaintiff's facial challenge to the "not prudent" regulation, 50 C.F.R. § 424.12(a)(1). On March 30, 2026, the court in *Center for Biological Diversity, et al. v. U.S. Department of the Interior, et al.*, No. 4:24-cv-4651-JST (N.D. Cal. Mar. 30, 2026), Dkt. 62 at 34-37, concluded that the language in § 424.12(a)(1)(ii)—allowing the U.S. Fish and Wildlife Service or the National Marine Fisheries Service to make a "not prudent" determination where "[t]he present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species"—did not violate the Endangered Species

Act on its face. *Id.*

A copy of the order is attached.

Dated: March 31, 2026.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
MEREDITH L. FLAX, Deputy Section Chief
NICOLE M. SMITH, Assistant Section Chief

*/s/ Sara M. Warren*
SARA M. WARREN, Trial Attorney
(GA Bar No. 966948)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel | (202) 598-5785
Fax | (202) 305-0275
Sara.Warren@usdoj.gov

*Attorneys for Defendant*

Exhibit 1

N.D. Cal. Case No. 4:24-cv-4651-JST

March 30, 2026 Order

(Docket Entry 62)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, et al.,<br><br>Defendants. | Case No. 24-cv-04651-JST<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR A STAY OR REMAND**<br><br>Re: ECF Nos. 37, 43 |

The United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (together, "the Services") administer the Endangered Species Act ("ESA"), 16 U.S.C § 1531 et seq.[1]  In 2019, the Center for Biological Diversity, Sierra Club, and WildEarth Guardians ("Plaintiffs") along with other organizations filed suit against the Services, alleging that certain ESA regulations promulgated in that year violated the ESA and that they were promulgated in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.  *See Ctr. for Biological Diversity v. Bernhardt*, 19-cv-05206 (N.D. Cal. Aug. 21, 2019) [*Bernhardt*], ECF No. 1.

This Court granted voluntary remand to the Services, which subsequently modified the challenged regulations in a 2024 rulemaking that left some portions of the 2019 rules intact. Plaintiffs then filed a new lawsuit challenging the 2024 and 2019 rulemakings on similar grounds: that the regulations are inconsistent with the ESA and that the 2024 rulemaking violated NEPA.

---

[1] The U.S. Fish and Wildlife Service implements the ESA for the Department of the Interior and has responsibility over terrestrial and freshwater species.  16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b).  The National Marine Fisheries Service implements the ESA for the Department of Commerce and has responsibility for marine and anadromous species. *Id*.

Plaintiffs seek vacatur of the challenged regulations and restoration of the versions of the rules in effect prior to 2019.  ECF No. 37 at 11.  The Services move for a stay or remand to accommodate a new rulemaking to be announced in October of 2025[2] and concluded in October of 2026.  *See* ECF No. 43 at 19.  In the alternative, they move to dismiss Plaintiffs' claims for lack of standing, or failing that, for summary judgment on the merits of Plaintiffs' claims.

The Court concludes that Plaintiffs have standing, that a remand or stay is not warranted under the circumstances, that four of six challenged regulatory provisions were unlawful because they contradict the text of the ESA or were arbitrary and capricious, and that the Services' 2024 rulemaking did not violate NEPA.  The Court therefore vacates the three invalidated regulatory provisions.

## I.     BACKGROUND

### A.     The Endangered Species Act

The Endangered Species Act reflects Congress's intent for "endangered species to be afforded the highest of priorities." *Tenn. Vall. Auth. v. Hill*, 437 U.S. 153, 174 (1978).  Congress intended "to halt and reverse the trend toward species extinction, whatever the cost." *Id*. at 184.  At issue in this case are regulations interpreting two of the ESA's core provisions: Section 4, which requires the Services to maintain and update a list of threatened and endangered species and their critical habitats, and Section 7, which requires other federal agencies to consult with the Services before taking actions that may affect listed species.

Section 4 of the ESA requires the Services to designate, or "list," species of flora and fauna as threatened or endangered because of destruction of habitat, overutilization by people, disease or predation, or "other natural or manmade factors," using the "best scientific and commercial data available."  16 U.S.C. § 1533(a)(1), (b)(1)(A).  An "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  A threatened species is "any species which is likely to become an endangered species

_____

[2] At the hearing on these motions, Defendants acknowledged that, in light of the governmental shutdown then in effect, proposed rules would not be submitted to the Office of the Federal Register by October 31, 2025.  The proposed rules were ultimately published in the Federal Register on November 21, 2025.  ECF No. 61.

2

within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

For species listed as threatened or endangered, Section 4 of the ESA requires the Services to designate "critical habitat"—areas of habitat essential to a species' conservation that are subject to special protections from destruction and degradation—concurrently with the species' listing. *Id.* §§ 1532(5), 1533(a)(3), (b)(2). Concurrent habitat listing is required "to the maximum extent prudent and determinable." *Id.* § 1533(a)(3).

Section 7, entitled "Interagency cooperation," obligates other federal agencies to consult with the Services to avoid harming listed species. 16 U.S.C. § 1536. It requires each federal agency, the "action agency," to "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" critical habitat. *Id.* § 1536(a)(2). This determination is made "in consultation with and with the assistance of" the Services. *Id.* The responsible Service is based on the species at issue. 50 C.F.R. § 402.01(b); *see supra* note 1.

The Section 7 regulations provide for both "informal consultation" and "formal consultation." *Id.* §§ 402.13, 402.14. If an action agency determines that an action "may affect," but is "not likely to adversely affect" listed species or their critical habitat, it may seek the responsible Service's concurrence in that determination, known as "informal consultation." *Id.* § 402.13. For actions that "may affect" listed species and have not received the "not likely to adversely affect" determination via informal consultation, formal consultation is required. *Id.* § 402.14(a), (b)(1).

When participating in formal consultation, the responsible Service is required to prepare a "biological opinion" evaluating the effects of the action.[3] *Id.* § 402.14(g), (h). If it finds that the action is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," it must provide "reasonable and prudent"

---

[3] "Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

United States District Court
Northern District of California

"measures" and "alternatives" that the action agency can take to avoid causing such negative impacts in violation of Section 7. *Id.* Like listing determinations under Section 4, Section 7 determinations about an action's impacts on listed species must be based upon "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

**B.    NEPA**

The National Environmental Policy Act ("NEPA") is a "procedural cross-check" designed to "inform agency decisionmaking." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 173 (2025). NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C) (2019 & 2024), with the aim of identifying resulting impacts and exploring alternative approaches and mitigations to lessen such impacts, *see* 42 U.S.C. § 4332(C)(iii), (F) (2024); 42 U.S.C. § 4332(C)(iii), (E) (2019). In this context, "the term 'actions' refers not only to construction of particular facilities, but includes project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973) (citation modified).

Pursuant to implementing regulations that were effective when the Services promulgated the rules, if an agency believes a proposed action is unlikely to have significant environmental effects, or is unsure whether it will do so, it may prepare a less exhaustive environmental assessment ("EA") of the action. 40 C.F.R. § 1501.5(a), (c) (2024); 40 C.F.R. §§ 1501.3, 1508.9 (2019); *see also* 42 U.S.C. § 4336(b)(2) (2024).

In other situations, neither an EIS nor an EA is required and federal agencies may invoke a categorical exclusion ("CE") from further NEPA analysis. *See* 40 C.F.R. § 1501.4 (2024); 40 C.F.R. § 1508.4 (2019); *see also* 42 U.S.C. §§ 4336(a)(2), 4336c (2024). CEs are appropriate only for categories of actions that the agency has previously determined "normally do not have a significant effect on the human environment." 40 C.F.R. § 1501.4(a) (2024); *see also* 40 C.F.R. § 1508.4 (2019). Even if an agency determines that a CE covers a proposed action, the agency must still "evaluate the action for extraordinary circumstances in which a normally excluded

United States District Court
Northern District of California

action may have a significant effect." *Id*. § 1501.4(b) (2024); *see also* 40 C.F.R. § 1508.4 (2019). If so, the agency "shall prepare an environmental assessment or environmental impact statement, as appropriate." 40 C.F.R. § 1501.4(b)(2) (2024); *see also* 40 C.F.R. § 1501.4 (2019). When relying on a CE, an agency "must supply a convincing statement of reasons why potential effects are insignificant." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citation omitted).

### C.     Factual & Procedural Background

On August 27, 2019, the Services promulgated final regulations modifying the implementation of Sections 4 and 7. 84 Fed. Reg. 45020 (Aug. 27, 2019); 84 Fed. Reg. 44976 (Aug. 27, 2019). The Services initiated these rulemakings pursuant to Executive Order 13777, which directed federal agencies to eliminate allegedly "unnecessary regulatory burdens." 82 Fed. Reg. 12285 (Mar. 1, 2017) ("Enforcing the Regulatory Reform Agenda"), *see* 83 Fed. Reg. 35174, 35175 (July 25, 2018). Plaintiffs filed a lawsuit in this Court challenging the final 2019 Regulations shortly after their publication. *See Bernhardt* ECF No. 1.

While that litigation was pending and following a change in Presidential administrations, Federal Defendants moved this Court for remand without vacatur of the 2019 Regulations, citing "substantial concerns" with the rules and an intent to rescind or revise them. *Bernhardt* ECF No. 146 at 27–29. Plaintiffs countered that the appropriate remedy was remand with vacatur, noting that "vacatur is the only option that avoids continuing environmental harms to listed species and their habitat due to the loss of, or significant reductions in, ESA protections that the Services themselves appear to admit are a direct and ongoing consequence of the 2019 Rules." *Bernhardt* ECF No. 149 at 18. This Court remanded and vacated the rules without adjudicating the merits of Plaintiffs' claims. *Bernhardt* ECF No. 168; *Ctr. for Biological Diversity v. Haaland*, 609 F. Supp. 3d 1058 (N.D. Cal. 2022).

While that ruling was on appeal, however, the U.S. Supreme Court issued a ruling in an unrelated proceeding casting doubt on the availability of pre-merits vacatur as a remedy. *See Louisiana v. Am. Rivers*, 142 S. Ct. 1347 (2022) (mem.). The Ninth Circuit then stayed the vacatur order pending this Court's consideration of the parties' motions to amend the judgment.

*United States District Court*
*Northern District of California*

*In re Wash. Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022). On reconsideration, this Court again remanded the 2019 Regulations, but this time without vacatur. *Bernhardt* ECF No. 198; *Ctr. for Biological Diversity v. Haaland*, 641 F. Supp. 3d 835 (N.D. Cal. 2022).[4]

The Services promulgated new regulations on April 5, 2024. 89 Fed. Reg. 24300 (Section 4); 89 Fed. Reg. 24268 (Section 7). In Plaintiffs' view, the 2024 regulations remedied certain issues in the 2019 regulations but retained or introduced others. ECF No. 37 at 16. In their complaint, Plaintiffs challenge six specific provisions introduced in the 2019 or 2024 rulemakings—four concerning Section 7 and two concerning Section 4. ECF No. 37 at 16, 19–44.

In January 2025, President Trump issued Executive Orders requiring agencies to review their regulations. *See* Exec. Order 14181, 90 Fed. Reg. 8747 (Jan. 24, 2025); Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025); Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025); Exec. Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025). Executive Order 14219 directs agencies to review regulations, like the 2024 regulations, for consistency with lawful "delegations of legislative power" and to ensure such regulations "are based on . . . the best reading of the underlying statutory authority or prohibition." 90 Fed. Reg. 10583. Executive Orders 14181, 14154, and 14156 direct the agencies to review regulations, including the ESA regulations, and revise or rescind any regulations that impose undue burdens or are contrary to law. *See* Exec. Order No. 14181 § 2(e), 90 Fed. Reg. at 8747–48; Exec. Order No. 14154 § 3(c), 90 Fed. Reg. at 8354; Exec. Order No. 14156 § 6(c), 90 Fed. Reg. at 8436. Pursuant to Executive Order 14154, the Secretary of the Interior directed the Department to develop a plan to "suspend, revise, or rescind" the 2024 Section 4 and 7 regulations. *See* Secretary's Order No. 3418 (Feb. 3, 2025).[5] The Services prepared proposed rules reconsidering the 2024 ESA Section 4 and 7 regulations and published them in the Federal Register on November 21, 2025. ECF No. 61. They anticipate submitting final rules to the Office of the Federal Register by October 31, 2026. ECF No. 43 at

---

[4] The Ninth Circuit subsequently held that a district court lacks authority to vacate an administrative rule "without first holding it unlawful." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023).
[5] https://www.doi.gov/document-library/secretary-order/so-3418-unleashing-american-energy.

United States District Court
Northern District of California

19.

## II.   JURISDICTION

### A.   Standing

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  And at summary judgment, Plaintiffs must make the requisite showings with "specific facts," not conclusory allegations. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Components (b) and (c) of organizational standing are easily satisfied here and not disputed; Defendants challenge Plaintiffs' members' standing to sue in their own right. *See* ECF No. 43 at 24–28.

Plaintiffs argue that the challenged regulations will weaken the protections of the ESA and thereby harm endangered species throughout the country.  They argue that the challenged Section 7 regulations will narrow the scope of consultation and decrease its efficacy in protecting endangered species from agency activities.  ECF No. 37 at 19–36.  And they argue that the challenged Section 4 regulations will result in (1) fewer species listed as "threatened," and (2) less critical habitat listed concurrently with listed species.  *Id*. at 36–44.  In sum, Plaintiffs aver that animal species in which their members have demonstrated interests have been and will be harmed to a greater extent under these weakened protections than they would have been under legally

adequate ESA regulations.  *Id*. at 17–18.  The Court concludes that Plaintiffs have standing to bring their claims.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Laidlaw*, 528 U.S. at 183 (citation modified).  "[T]he desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose[s] of standing."  *Lujan*, 504 U.S. at 562–63.

Plaintiffs have provided declarations from specific members whose concrete interests in viewing specific listed species would be impaired by any harm to those species caused by the weakened ESA regulations.  One such member, Noah Greenwald, enumerates species of interest to him that were denied listing under the ESA because of the regulations' challenged definition of the "foreseeable future."  ECF No. 23-2 at 5.  He also enumerates species with listing petitions pending, which he believes will also be denied because of the "foreseeable future" definition.  *Id*.  Another declarant, William Foster II, describes his love of sea turtles and identifies biological opinions produced under the challenged regulations that insufficiently protect sea turtles in the Gulf by giving undue weight to non-binding mitigation measures—the subject of another of Plaintiffs' challenges.  ECF No. 23-3 at 7–8.  A third, Andrew Whitehurst, describes the specific ways that the challenged definition of "destruction or adverse modification" led a drainage project to receive a favorable biological assessment despite significant harm to listed species' habitat.  ECF No. 23-4 at 5–6.  Plaintiffs' declarations detail members' concrete plans to continue enjoying specific listed species in specific geographic areas and outline the harms that have been or will be incurred by those species because of the challenged ESA regulations.  *See* ECF Nos. 23-2–23-12.

Defendants take a kitchen-sink approach to contesting the sufficiency of Plaintiffs' injury.  Citing *Summers v. Earth Island Institute*, they argue that Plaintiffs do not have standing to bring a facial challenge "unconnected to any concrete application of the regulation that injures Plaintiffs or their members."  ECF No. 43 at 24 (citing 555 U.S. 488, 494 (2009)).  But in *Summers*, the plaintiffs failed to show that they had a "personal stake in the outcome of the controversy" because the record contained no evidence that any plaintiff still at issue in the suit had specific and

United States District Court
Northern District of California

concrete plans to visit an area to view flora and fauna that would be harmed by a particular project resulting from the challenged regulations. *Id*. at 493, 494–95. By contrast, here, the record is replete with affidavits from members describing specific plans to continue enjoying flora and fauna that have been or will be harmed by the challenged regulations through specific consultation and listing decisions. The harms identified by plaintiffs are "actual or imminent" and not purely speculative.[6]

Defendants next assert that Plaintiffs' standing claims rely on "guesswork about how third parties will respond to the ESA regulations." ECF No. 43 at 24. But Plaintiffs' declarations explain how the regulations have already directly affected the Services' listing and consultation decisions, providing strong evidence that such effects will continue. Moreover, as Plaintiffs argue, it requires no guesswork to conclude "'that lower environmental safeguards at the national programmatic level will result in lower environmental standards at the site-specific level.'" ECF No. 37 at 47–48 (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003)).

Courts have routinely found that environmental plaintiffs have standing to challenge the failure to consult or to reinitiate consultation, even though the action agency has some autonomy to decide how to respond to the results of consultation in its implementation of the action. *See, e.g.*, *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) ("The requirement that consultation be reinitiated protects a 'concrete threatened interest' that is the basis of Salmon Spawning's standing, the avoidance of harm to listed species."); *Washington Toxics Coalition v. U.S. Department of the Interior*, 457 F. Supp. 2d 1158, 1166, 1168 (W.D. Wash. 2006) (finding that the plaintiffs had standing to challenge the agency's failure to consult concerning pesticide registration). By the same token, Plaintiffs have standing to challenge regulations that modify the scope of consultation, as the challenged Section 7 regulations do here.

---

[6] Defendants also argue that "Plaintiffs cannot show that every future application of the regulations will injure them." ECF No. 43 at 27. Defendants conflate the standard for a facial challenge, which requires the regulations to be unlawful in every application, with the standard for standing, which only requires that the challenged regulations visit a concrete and actual or imminent harm upon the Plaintiffs. *See Laidlaw*, 528 U.S. at 180–81.

9

In the same breath that Defendants challenge Plaintiffs' ability to demonstrate injury through projected *future* harm, they argue that Plaintiffs may not rely on *past* agency actions to establish injury.  ECF No. 43 at 24.  They argue that such past actions are not redressable because Plaintiffs' complaint does not directly challenge them.  *Id*. at 24–25.  But Plaintiffs cite past harms as evidence of the likelihood of future harm.  *See* ECF No. 53 at 16 ("[T]he declarations demonstrate the kinds of injuries caused by the 2019 and 2024 Regulations to Plaintiffs' interests, which will continue absent relief from this Court.").  Moreover, some of the past harms described by Plaintiffs could only be redressed after vacatur of the challenged regulations.  For instance, Plaintiffs may be able to correct adverse listing decisions through future listing petitions after the regulatory provision that caused the petitions to be denied is vacated.  *See, e.g.*, ECF No. 23-2 at 5; ECF No. 23-11 at 4–5.

Relatedly, Defendants argue that Plaintiffs link these past harms to the challenged regulatory provisions only through conclusory statements.  ECF No. 43 at 25.  But that is not the case.  For example, Plaintiffs' declarant Andrew Whitehurst explained exactly how the challenged definition of "destruction or adverse modification" led negative impacts on 19.37 miles of Gulf sturgeon habitat to be disregarded in a Section 7 consultation because those miles made up only 3.9% of the whole—a frame of analysis allowed by the challenged regulations.  *See* ECF No. 23-4 at 5–6.  And Defendants do not argue that the declarations' descriptions of past listing and consultation decisions like this one, or the effects of those decisions, are inaccurate.

Defendants do not otherwise meaningfully challenge causation and redressability.[7]  The Ninth Circuit has held that environmental plaintiffs have standing to challenge programmatic policies that will predictably harm plaintiffs' concrete interests in specific animals and their habitats.  *See Cottonwood Env't L. Ctr.*, 789 F.3d at 1081 (holding that "a plaintiff has standing to

---

[7] In a footnote, Defendants cite *Lujan* for the proposition that redressability is purely speculative because "action agencies have control, in first instance, whether to engage in Section 7 consultation with Services."  ECF No. 43 at 27 n.3.  This argument grossly misrepresents the statute and the discussion in *Lujan*.  The statute provides that action agencies "shall" engage in consultation.  16 U.S.C. § 1536(a)(2).  And in *Lujan*, the redressability discussion noted that the action agencies might not to undergo Section 7 consultation because they disputed whether it applied to actions taken in foreign nations.  *See* 504 U.S. at 568–69.  *Lujan* did not take the position that Section 7 consultation was generally optional.

challenge programmatic management direction without also challenging an implementing project that will cause discrete injury" as long as the programmatic direction is "fairly traceable to some action that will affect the plaintiff's interests").  In *Defenders of Wildlife v. EPA*, the plaintiffs challenged the decision to shift pollution permitting authority from the EPA to a state agency, which would remove hypothetical future permitting decisions from the Section 7 consultation requirement.  420 F.3d 946, 952 (9th Cir. 2008), *rev'd on other grounds by Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 671–73 (2007).  The Ninth Circuit found that the plaintiffs had standing to challenge the shift in authority because "section 7 consultation ha[d] in the past led to mitigation measures . . . and ha[d] thereby protected listed species and their habitat."  *Id*. at 956.

Plaintiffs have standing to challenge the regulations governing Section 4 listing decisions and Section 7 consultations, including provisions that were introduced in 2019 and remain in effect in the 2024 versions.[8]  As this Court concluded in Plaintiffs' prior facial challenge to the 2019 ESA regulations, "an enhanced risk of biodiversity loss and degradation of fish and wildlife natural resources clearly follows from the Services' alleged weakening of ESA safeguards."  *California v. Bernhardt* , 19-cv-6013-JST (N.D. Cal. May 18, 2020), ECF No. 98 at 9 (cleaned up).  In short, Plaintiffs have standing to challenge the regulations because the stronger protection of more stringent consultation and listing requirements will likely protect species in the myriad ways documented in Plaintiffs' standing declarations.

Plaintiffs also assert standing to challenge the agencies' procedural failures to adhere to the Administrative Procedure Act's ("APA") prohibition on arbitrary and capricious decisionmaking, 5 U.S.C. § 706(2)(A), and to comply with NEPA.  Plaintiffs alleging procedural injury "must show that the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing."  *W. Watersheds Project v. Kraayenbrink*, 632

_____

[8] Defendants argue that Plaintiffs do not have standing to challenge harms that arose from the 2019 regulations because those regulations have been superseded by the 2024 regulations.  ECF No. 43 at 25–26.  But again, Plaintiffs do not seek redress for concrete past harms, but rather seek prospective relief prohibiting future enforcement of the operative regulations, which they argue are unlawful.

11

F.3d 472, 485 (9th Cir. 2011). Having done so, they enjoy relaxed standards for traceability and redressability, and "'must show only that they have a procedural right that, if exercised, *could* protect their concrete interests.'" *Salmon Spawning*, 545 F.3d at 1226 (quoting *Defs. of Wildlife v. EPA*, 420 F.3d at 957) (emphasis in original). Defendants concede that Plaintiffs have established procedural standing as long as they can show an underlying "concrete interest that is affected by the deprivation" of a procedural right. ECF No. 43 at 28 (quoting *Summers*, 555 U.S. at 496). Because the Court concludes that Plaintiffs have shown an underlying concrete interest, they also have standing to challenge the alleged arbitrary and capricious rulemaking and NEPA violation.

### B.    Statutory Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1331.

## III.    MOTION FOR REMAND OR STAY

In light of the Services' pending rulemaking, Defendants move for remand without vacatur to the agency or, in the alternative, a stay of proceedings until rulemaking concludes. They argue that "[t]he rulemaking will moot or, at a minimum, substantially alter the disputes in this case." ECF No. 43 at 21.

### A.    Remand

"Courts generally grant an agency's request for voluntary remand unless the request is frivolous or made in bad faith." *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 60 (9th Cir. 2022) (citing *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)). At the same time, however, courts enjoy "broad discretion" to grant or deny a voluntary remand request. *Id.* (quoting *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018)). "That broad discretion allows a court to deny a voluntary remand—and thus to proceed to decide the merits of the case—if the risk of harm from indefinitely leaving an allegedly unlawful rule in place outweighs considerations of judicial and administrative efficiency." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023). Courts likewise have broad discretion to deny an agency's remand request when the primary questions concern issues of statutory interpretation and "the agency is either compelled or forbidden by the governing statute to reach a different result" than the challenged decision. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir.

2001) (drawing that conclusion in a pre-*Loper Bright* context).  The Court finds that both the risk of harm to Plaintiffs and the purely legal nature of the dispute counsel against granting remand.

First, Plaintiffs have identified a high likelihood of harm resulting from further delays in adjudication of the merits because of the weaker protections for listed species afforded by the challenged regulations.  Defendants raise several responses.  They argue that remand will not cause "undue harm" because "[t]he agencies are proceeding expeditiously and without delay." ECF No. 43 at 22.  But even according to Defendants' projected schedule, there will be no final rule for another year.  *Id*. at 23.  A year's worth of harm is worth avoiding.  Defendants also argue that there would be no harm to Defendants from a delay in adjudicating their facial claims because they could still mount as-applied challenges.  ECF No. 43 at 23; ECF No. 54 at 12.  But that only kicks the can down the road by delaying until later a decision the Court can make now—without putting the parties to the effort and expense of yet another lawsuit.  There is nothing species- or habitat-specific about the regulations such that waiting for an as-applied challenge will improve judicial decision-making.

Second, the Court is not persuaded by the Agencies' argument based on *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  As summarized by Defendants, *Loper Bright* "overruled longstanding precedent requiring courts to defer to an agency's interpretation of ambiguous statutory text and set a new framework that considers a single 'best reading' of a statute."  ECF No. 43 at 22 (citing *Loper Bright*, 603 U.S. at 400, 412–13).  They argue that remand will enable the Services to "consider these new standards during the rulemaking, which could obviate the need for review."  *Id.* (citation and quotation omitted).  In *Loper Bright*, the Supreme Court held that courts may not defer to agencies' interpretation of the statutes they implement.  603 U.S. at 413.  Rather, courts must use their independent judgment to determine the best reading of the statutory text at issue.  *Id*. at 412–13.  But while *Loper Bright* changed the *courts'* role in statutory interpretation and regulatory analysis, it did not change the *agencies'* role, which is to adopt the best possible interpretation of the statute.  *Zumbro v. Gunther*, No. CV-24-01452-PHX-KML (ASB), 2025 WL 977476, at *1 (D. Ariz. Feb. 28, 2025), *report and recommendation adopted,* No. CV-24-01452-PHX-KML, 2025 WL 976798 (D. Ariz. Apr. 1,

United States District Court
Northern District of California

13

2025) ("The *Loper Bright* decision did not change what an agency can or cannot do—it changed how the courts review agencies' interpretations of the law.").  Thus, consideration of the "new standards" in *Loper Bright* will not assist the agencies in statutory interpretation or otherwise obviate the need for the Court to pass on the legality of the challenged regulations.  Better that the Court provide the agencies with its reading now so the agencies can consider it as they undertake their review, rather than after further modifications that might bake in—or even exacerbate—any problems the Court might find.

Finally, the Court notes some concerns about the propriety of voluntary remand without vacatur where the underlying agency action is a rulemaking.  In *Utah v. EPA*, cited in the Defendants' brief, the D.C. Circuit noted that it could not identify any authority allowing it to remand a rulemaking and therefore terminate litigation without resolving the substantive merits. No. 23-1157, 2025 WL 1354371, *4 (D.C. Cir. May 2, 2025).  While remand might make sense when allowing an agency to address its own error in the context of an adjudication, it makes less sense in the context of a rulemaking, which can be initiated at any time and must follow the same APA procedures regardless of "[a] judicial directive to 'remand' a rule for 'reconsideration.'"  *Id*. at *5.  When remand is without vacatur, moreover, the rule remains binding on the petitioners and other parties until a replacement rule is finalized, risking the forfeiture of judicial review where the original rule is left in place and statutes of limitation or repose have elapsed.  *Id*.  The Court will not remand to the agency for rulemaking.

### B.  Stay

Similar factors counsel against granting a stay.  In considering a stay request, courts must weigh "competing interests," including: (1) "the possible damage which may result from a stay," (2) "the hardship or inequity which a party may suffer [if] required to go forward," and (3) whether a stay could simplify or complicate "issues, proof, and questions of law." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)).  The moving party bears the burden of justifying a stay. *Clinton v. Jones*, 520 U.S. 681, 708 (1997).  A district court's decision to grant or deny a *Landis* stay is a matter of discretion.  *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th

United States District Court
Northern District of California

Cir. 2007).

All three *Landis* factors support denying a stay here. A "fair possibility" of harm suffices to meet the first factor, *Lockyer*, 398 F.3d at 1112, and the Court has already concluded that Plaintiffs have sufficiently identified likely harm flowing from the challenged regulations. In opposing the motion for a stay, they further identify at least one example of an agency action that relied on the challenged rules to the detriment of listed species. ECF No. 53 at 10; *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 797–800 (D. Alaska 2021) (agency used challenged section 7 regulations concerning mitigation measures used to defend pollution permits). These incidents of past harm suffice to establish a "fair possibility" of similar harm in the future.

Under the second stay factor, "[i]f there is even a fair possibility that [a] stay . . . will work damage to some one else," the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255; *see also Lockyer*, 398 F.3d at 1109. The Services have made no colorable argument that they would face hardship or inequity from the denial of a stay. Denying a stay will facilitate resolution of the legality of the Service's rulemaking.[9] At best, resolving this case will provide the Services with helpful guideposts in their current rulemaking. At worst, the Court's ruling will be mooted by the new final rules—and Defendants will still not be harmed. *See Arizona Yage Assembly v. Barr*, No. 20-cv-03098, 2020 WL 5629833, at *8 (N.D. Cal. Sept. 21, 2020) ("If the plaintiffs' claims are ultimately meritless, resolution of this litigation will not affect the rulemaking. And if the plaintiffs' claims are ultimately correct, [the agency] will have the guidance of an additional judicial ruling.").

Finally, because the Services have not asserted any intention to revisit the issues of concern to Plaintiffs, they have failed to show that a stay would simplify issues of law, *Lockyer*, 398 F.3d at 1110; promote the "orderly course of justice," *id.*; or provide "economy of time and effort for [the Court], for counsel, and for litigants," *Landis*, 299 U.S. at 254. Accordingly, the

---

[9] Defendants' suggest without merit that a decision on the merits would be an "advisory opinion[.]" ECF No. 43 at 23. That Plaintiffs' concerns may be alleviated or mooted by a final rule to be issued a year or more from now does not alter the fact that the current controversy is ripe.

15

Court will not grant a stay.  *See Ariz. Yage*, 2020 WL 5629833, at *7 (denying a stay because the "timeframe is too indeterminate to grant a stay and there is no guarantee that the plaintiffs' claims would be affected, let alone mooted, by the existence of new regulations").

## IV.    SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Both parties' motions raise purely legal issues under the ESA, NEPA, and the APA, rendering summary judgment appropriate.  *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (holding that a district court "is not required to resolve any facts" when deciding whether to grant summary judgment in an APA review of an administrative proceeding).

Plaintiffs challenge certain regulatory provisions as facially inconsistent with the ESA. "To prevail in such a facial challenge, [plaintiffs] 'must establish that no set of circumstances exists under which the [regulation] would be valid.'"  *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 599 (9th Cir. 2018) (applying "no set of circumstances" test to facial challenge to agency regulation).  A regulatory provision may violate the statute on its face if it exceeds the statute's limits or is inconsistent with the statute's plain meaning.  *See, e.g.*, *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1185 (D.C. Cir. 2020); *Regents of Univ. of Cal. v. Shalala*, 82 F.3d 291, 294 (9th Cir. 1996).  In matters of statutory construction, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires," and determine the "best reading" of the statute.  *Loper Bright*, 603 U.S. at 400, 412.

Plaintiffs also bring some claims under the APA's prohibition on agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  An action is "arbitrary and capricious if the agency has relied on factors which

United States District Court
Northern District of California

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

Lastly, Plaintiffs argue that Defendants failed to perform their obligations under NEPA. In reviewing an agency decision not to prepare an EIS pursuant to NEPA, the Court considers "whether the responsible agency has reasonably concluded' that the project will have no significant adverse environmental consequences." *San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980) (citation omitted).

### B.    Merits

Plaintiffs challenge four discrete amendments to the Section 7 interagency consultation regulations and two discrete amendments to the Section 4 critical habitat provisions. Plaintiffs argue that the challenged regulatory provisions "conflict with the plain terms of the statute and undermine the ESA's fundamental purpose of preserving imperiled species and their habitat." ECF No. 37 at 16. The Court takes each challenged provision in turn, concluding that four of the challenged Section 7 regulations violate the statute or are arbitrary and capricious. The Court concludes that Plaintiffs have not shown that the two challenged Section 4 regulations are unlawful.

### 1.    § 7: "Reasonably Certain to Occur"

Section 7 consultation requires the action agency and the responsible Service to evaluate the effects of the agency action on listed species and their critical habitat. *See generally* 16 U.S.C. § 1536. Before the 2019 rulemaking, the ESA regulations defined "effects of the action" to "refer[] to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018). It further defined "[i]ndirect effects" as "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* The 2019 rulemaking amended the definition to "all consequences to listed species or critical habitat that are

17

caused by the proposed action, including the consequences of other activities that are caused by the proposed action" and provided that "[a] consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur."  50 C.F.R. § 402.02 (2019).  This 2019 definition was left in place by the 2024 rulemaking.  Plaintiffs challenge the inclusion of language requiring that effects "would not occur but for the proposed action and [are] reasonably certain to occur" as contrary to the statutory text and arbitrary and capricious.

The relevant statutory text requires federal agencies, through consultation with the Services, to "insure" that their actions are "not likely to jeopardize" listed species or adversely modify their habitat.  16 U.S.C. § 1536(a)(2).  If the responsible Service cannot conclude that the proposed agency action is not likely to place the listed species in jeopardy or adversely modify its critical habitat, then it must "suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by the Federal agency . . . in implementing the agency action."  *Id*. § 1536(b)(3)(A).  In reaching such determinations, both the Services and the action agency must "use the best scientific and commercial data available."  *Id*. § 1536(a)(2).  Importantly, the regulations implementing the consultation requirements limit the scope of the analysis to the "effects of the action."  *See, e.g.*, 50 C.F.R. § 402.14(c), (g), (h).

Plaintiffs argue that the "reasonably certain to occur" modifier contradicts the statute's requirements 1) that the agency use the best scientific data available and 2) that jeopardy be "likely."  The Court agrees that requiring effects of the action to be "reasonably certain to occur" before the Services can consider them violates the statute's text for both reasons.

Plaintiffs first argue that this language violates the ESA's "best available data" requirement "by forcing the Services to ignore effects grounded in rigorous science, but for which the probability of occurrence is less than the Service's vague new threshold for certainty."  ECF No. 37 at 20–21.  The "best available data" requirement works in two directions, compelling the Services to seek out the best possible information while also prohibiting them from ignoring imperfect or incomplete information when it is the best information available.  *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).  "Essentially, [the Services] 'cannot ignore available

United States District Court
Northern District of California

biological information.'"  *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006) (quoting *Conner*, 848 F.2d at 1454).

Courts have repeatedly linked the requirement that the Services use the best available data—even if that data is poor—to their obligation to assess the likelihood of jeopardy to listed species or adverse modification of their habitat.  In *Oceana, Inc. v. Evans*, for instance, the court upheld NMFS's use in a Section 7 consultation of a population model that involved a degree of "uncertainty" because it was "most reliable method."  384 F. Supp. 2d 203, 214–15, 218 (D.D.C. 2005).  In so doing, the court reasoned that "[t]ime and again courts have upheld agency action based on the 'best *available*' science, recognizing that some degree of speculation and uncertainty is inherent in agency decisionmaking, even in the precautionary context of the ESA."  *Id*. at 219 (emphasis in original).  Likewise, in *Greenpeace Action v. Franklin*, the Ninth Circuit upheld NMFS's "no jeopardy" determination based on management measures that were concededly "uncertain" because they were designed based on the best available information.  14 F.3d 1324, 1335 (9th Cir. 1992).  In both cases, the agency was required to consider evidence of events that was "likely" but "uncertain"—far from the "reasonable certainty" required by the challenged regulations.

In *Conner*, the Ninth Circuit held "that the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action, and thus failing to adequately assess whether the agency action was likely to jeopardize the continued existence of any threatened or endangered species, as required by section 7(a)(2)."  848 F.2d at 1454.  It is therefore through the "best available" requirement that the Services can determine the likelihood of jeopardy; to the extent that the "reasonable certainty" requirement excludes evidence that is the best available, it violates the statute.

The Ninth Circuit has recognized that only under extreme circumstances is evidence too poor to warrant mandatory consideration under the "best available data" rule.  In *Turtle Island*, the court held that NMFS was not required to consider the impacts of climate change on certain turtle species listed under the ESA where "there was *no available data* from which it could credibly project the impacts that climate change would have."  *Turtle Island Restoration Network v. U.S.*

19

*Dep't of Comm.*, 878 F.3d 725, 740 (9th Cir. 2017) (emphasis added).  The plaintiffs had not sufficiently refuted the agency's explanation that "climate change effects could not be 'reliably quantitified' nor 'qualitatively described or predicted,'" so NMFS's biological opinion was not disturbed on that basis.  *Id*.  *Turtle Island* establishes that the quality floor below which the Services are not required to consider relevant scientific information is very low indeed—far lower than the "reasonable certainty" required by the challenged regulations.

Defendants argue that the "reasonable certainty" requirement is consistent with the statute's "best available data" requirement because "[t]he Services consider all relevant information to identify the best available data and then apply their definition of 'effects of the action' to determine what are properly considered the effects of a proposed act."  ECF No. 43 at 33.  The problem for Defendants is that the statute imposes a mandatory duty on the Services to analyze the likelihood of jeopardy or harm to habitat using the best data available.  The process envisioned by Defendants violates this requirement because it ensures that categories of evidence are removed from consideration before the Services analyze the likelihood of jeopardy or harm.  In other words, under Defendants' portrayal of the challenged regulations, while the Services may initially gather the best available evidence, they only *consider* that evidence when it pertains to an effect the Services deem "reasonably certain to occur."  Insofar as the Services exclude from consideration at the last step scientific evidence of effects that are not "reasonably certain," they cannot meaningfully be said to have taken that evidence into account in making the ultimate jeopardy determination.[10]  That violates the ESA.

Plaintiffs also argue that limiting "effects of the action" to those that are "reasonably certain" violates the statute by prohibiting the Services from considering effects that are likely, but

---

[10] In a similar vein, Defendants argue that the "best available data standard" does not "erect any specific causation standard or specify how the Services must weigh any available information."  ECF No. 43 at 33.  This is true so far as it goes and means that the Services have a measure of discretion.  *Cf. Forest Serv. Emps. for Env't Ethics v. United States Forest Serv.*, 341 F. Supp. 3d 1217, 1232 (W.D. Wash. 2018) (upholding Forest Service's consideration of whether electronic warfare training "would be compatible and in harmony with the surroundings," given that the "requirement is not very specific," so "the Forest Service has the discretion to interpret it reasonably").  What the Services may not do is exclude "best available data" from consideration altogether by defining it out of the definition of "effects of the action."

United States District Court
Northern District of California

United States District Court
Northern District of California

not reasonably certain, to cause jeopardy or adverse modification of habitat.  The statute requires the Services to determine whether jeopardy or adverse modification is "likely."  16 U.S.C. § 1536(a)(2).  The Ninth Circuit and the D.C. Circuit have concluded that "likely" in the ESA context means "more likely than not."  In 2023, the D.C. Circuit held that:

> In 1979, when the term was added to the ESA, "likely" meant "probable" or "[i]n all probability." *Black's Law Dictionary* 834 (5th ed. 1979). Indeed, elsewhere in the ESA, the Service has read "likely" to mean "more likely than not." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016). We see no reason to depart from that usage. Section 7, therefore, requires the action agency to avoid acts that will more likely than not jeopardize a species. No more, and no less.

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595 (D.C. Cir. 2023). The Ninth Circuit's *Alaska Oil*, cited by the D.C. Circuit in *Maine Lobstermen's Ass'n*, discussed the meaning of the word "likely" in the context of Section 4 listing decisions.  *Alaska Oil*, 840 F.3d at 684.  It concluded that "likely" means "more likely than not" or "probable" and does not necessarily correspond to specific quantitative targets.  *Id.*  In excluding from consideration effects which are "likely" but not "reasonably certain," the challenged regulations block the Services from complying with their statutory mandate to ensure that agency actions are not likely to jeopardize listed species or harm their critical habitat.

Defendants argue that "reasonably certain to occur" is synonymous with "likely."  ECF No. 43 at 31.  The Court is not persuaded by this argument.  For one thing, the fact that the Services adopted the phrase "reasonably certain" belies their litigation position; if that's what they thought, they could simply have borrowed the word "likely" from Section 7(a)(2)—which would have had the additional benefit of consistency with the underlying statute.  For another, the words mean different things.  Defendants cite Merriam-Webster's Collegiate Dictionary, on whose meanings the Court has previously relied.  *See, e.g., Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 853 (N.D. Cal. 2023) (citing definition of "troll"); *Satterlee v. Great Lakes Ins. SE*, No. 21-CV-01774-JST, 2023 WL 3607283, at *4 (N.D. Cal. Mar. 23, 2023) (citing definitions of "fence" and "lock"); *Su v. Siemens Indus., Inc.*, No. 12-CV-03743-JST, 2014 WL 3615582, at *2 (N.D. Cal. July 22, 2014) (citing definition of "bona fide").  But Merriam-Webster defines likely as "having a

21

high probability of occurring or being true[;]very probable," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993), which is a lower standard than "reasonably certain." And Black's Law Dictionary, which Defendants also cite, define "likely" at an even greater distance from "reasonably certain"—defining it as a "strong tendency" or "reasonably expected." Black's Law Dictionary (12th ed. 2024). Defendants' position is also at odds with common usage. For example, one need only consider Benjamin Franklin's famous observation that "in this world, nothing can be said to be certain, except death and taxes." Letter to Jean-Baptiste Leroy (November 13, 1789) as quoted in John Bartlett & Justin Kaplan, Bartlett's Familiar Quotations (16th ed. 1992). The quotation survives insertion of the word "reasonably" but falls apart with substitution of the word "likely."

At least two Courts of Appeals have had occasion to address the meaning of "reasonable certainty" in this context and have concluded that it is more stringent than "likely." The Fifth Circuit has held that "reasonably certain" requires something more than a "substantial degree of certainty," *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010), and therefore is a higher standard than "likely." The Ninth Circuit's definition is less specific but seems to also require a degree of certainty higher than likelihood. It provides that:

> [A]n effect is reasonably certain to occur if its occurrence is based on "clear and substantial information," 50 C.F.R. § 402.17(b) (2019), not "speculation or conjecture," 84 Fed. Reg. at 44,977. Although the effect need not be "guaranteed to occur," there must be a "degree of certitude" it will happen. 84 Fed. Reg. at 44,977. This is not a particularly stringent standard to meet, but the government must do more than rely on speculation sprinkled with dabs of evidence. So, unlike what CBD implies, this does not mean that the Service could credit the PPF easement for water savings only if the easement were to interrupt a specific, identified deal to use the land for agricultural purposes. Rather, *there must be "solid information"* that agricultural use *would have occurred* in the counterfactual world in which the easement did not exist.

*Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023) (emphasis added).

Defendants argue that "the best reading of Section 7 requires the Services to apply principles of proximate causation in making the cause-and-effect determinations required by Section 7." ECF No. 43 at 30. They draw on the statute's requirement that the responsible Service provide a written opinion "detailing how the agency action affects the species or its

22

critical habitat." 16 U.S.C. § 1536(b)(3)(A). They argue that "[w]hen a statute requires this type of cause-and-effect inquiry, proximate causation principles, including foreseeability, apply." ECF No. 43 at 30. In Defendants' view, the foreseeability requirement of proximate cause justifies limiting effects of the action to those that are "reasonably certain to occur."

Neither of the cases Defendants cite support their argument. First, they cite a footnote from *Sweet Home* discussing Section 9 of the ESA, which prohibits private parties from harming or otherwise taking endangered species. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 696 (1995). The Court suggested there that "either the 'knowingly violates' or the 'otherwise violates' provision of the statute—or the 'harm' regulation itself—should . . . be read to incorporate ordinary requirements of proximate cause and foreseeability." 515 U.S. at 696 n.9. But whether a proximate cause requirement should be imported into a statute prohibiting, and authorizing civil penalties for, private conduct has no bearing on whether a statute requiring an agency to consider the effects of an action should be read to limit those effects to ones that would be cognizable in an action for negligence.

Defendants also cite to *Home Builders* in support of finding that proximate cause principles apply, but that case is even less relevant. *Home Builders* merely holds that an agency does not violate Section 7's consultation requirement by taking an action that it was legally required to take under Section 402(b) of the Clean Water Act. 551 U.S. at 647. The *Home Builders* court reconciled Section 7 with the mandates of Section 402(b) by explaining that "when an agency is *required* to do something by statute, it simply lacks the power to 'insure' that such action will not jeopardize listed species" within the meaning of 16 U.S.C. § 1536. *Id*. (emphasis in original). The *Home Builders* analysis reflects the principle that "an agency cannot be considered the legal 'cause' of an action that it has no statutory discretion *not* to take" and has no relevance to the scope of the effects analysis in a Section 7 consultation. *Id*. (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004)) (emphasis in original).[11]

In short, Defendants have not identified any reason to import a proximate causation

---

[11] The role of but-for causation in the Section 7 analysis been the subject of competing concurrences in a recent Ninth Circuit opinion. *See Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 1019 (9th Cir. 2025).

standard into the effects analysis under Section 7.  But even if they were correct that proximate causation, with its "but for" and "foreseeability" elements, applied, *see* ECF No. 43 at 31, they have not shown that an effect that is "likely" but not "reasonably certain" is not foreseeable; and that being so, the argument does not justify a "reasonably certain" standard.  Because the requirement that effects be "reasonably certain to occur" is more stringent than the statute's requirement that effects be likely, the Services' "effects of the action" definition is facially invalid.[12]

Finally, the Court agrees with Plaintiffs that the adoption of the "reasonably certain to occur" test was arbitrary and capricious because it was not adequately explained.  ECF No. 37 at 24.  Before 2019, the regulations provided that "indirect" effects were subject to a "reasonable certainty" limitation, but "direct" effects were not.  *See* 50 C.F.R. 402.02 (2018).  In making the change, the Services explained that they merged the two categories because confusion regarding the application of terms had "resulted in time being spent determining how to categorize an effect, rather than simply determining what the effects are regardless of category."  83 Fed. Reg. at 35183; 84 Fed. Reg. at 44989.  The Services explained that they "simply applied their longstanding reasonable certainty standard to all effects of a proposed agency action, explaining that the simplification would not change 'what types of effects or activities will be considered within our consultations.'"  ECF No. 43 at 35–36 (quoting 83 Fed. Reg. at 35183–84); *see also* 89 Fed. Reg. at 24268, 24271, 24272.  In other words, the Services justified the amendment by taking the position that it had no effect on the decision-making process.  As set forth above, however, the effect was significant.  "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.  An agency may not, for example, depart from a prior policy sub silentio."  *Fed. Commc'ns Comm'n v. Fox*

---

[12] Defendants cite cases rejecting facial challenges where the challenged regulation may conform to the statute in some instances, but those cases are not applicable here.  *See* ECF No. 43 at 29.  For instance, in *Bondi v. VanDerStok*, the regulation at issue defined "firearm" to include some partially complete, disassembled, or nonfunctional frames or receivers and weapon parts kits.  604 U.S. 458, 465 (2025).  The Court held that certain weapon parts kits, prior to assembly, *did* constitute a "weapon" within the meaning of the governing act, so the facial challenge failed.  *Id*. at 468.  Here, however, requiring effects to be "reasonably certain" will never result in measuring only whether they're "likely"—as required by the statute.

United States District Court
Northern District of California

*Television Stations*, 556 U.S. 502, 515 (2009).  Moreover, the Services' conclusory argument that the change was intended to reduce "time spent determining how to categorize an effect" is not an adequate or plausible justification for diluting the protection against agency actions that place a listed species in jeopardy or adversely modifies its critical habitat.  In explaining a substantive change to regulations, "conclusory statements will not do; an "agency's statement must be one of *reasoning.*"  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty. v. Hogen,* 613 F.3d 190, 194 (D.C. Cir. 2010)).  The Services' explanation fails this test.

### 2.     § 7: Consideration of Non-Binding Mitigation Measures

The ESA regulations require the Services, in consulting with an action agency and preparing a biological opinion, to "give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant."  50 C.F.R. § 402.14(g)(8) (2025).  In the 2019 rulemaking, the Services added the following language: "Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans."  *Id.*

Plaintiffs argue that the new regulations prevent the Services from fulfilling their statutory obligation to "insure" against jeopardy by forcing them to consider amorphous, non-binding mitigation plans in making no-jeopardy findings.  ECF No. 37 at 26.  As the Supreme Court has recognized in construing Section 7(a)(2), "[t]o insure something . . . means to make certain, to secure, to guarantee."  *Home Builders*, 551 U.S. at 667 (citation modified).

Ninth Circuit caselaw requires mitigation measures to be excluded from consideration unless they are binding on or guaranteed by the agency or otherwise reasonably certain to occur.  In *National Wildlife Federation v. National Marine Fisheries Service*, environmental organizations challenged NMFS's determination that the operation of dams would not jeopardize ESA-listed salmon and steelhead or adversely modify their habitat. 524 F.3d 917 (9th Cir. 2008).  NMFS's biological opinion to that effect relied on the action agency's stated intention to make structural improvements aiding safe passage for the fish.  *See id*. at 935–36. The Ninth Circuit rejected NMFS's determination, stating, "[W]e are not persuaded that even a sincere general

commitment to future improvements may be included in the proposed action in order to offset its certain immediate negative effects, absent specific and binding plans. Although the record does reflect a general desire to install structural improvements where feasible, it does not show a clear, definite commitment of resources for future improvements." *Id.*; *see also Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1258 (9th Cir. 2017) ("[O]ur precedents require an agency to identify and guarantee mitigation measures that target certain or existing negative effects.").  The Ninth Circuit's interpretation of the statute as requiring firm assurances that mitigation measures will be undertaken follows logically from the statutory mandate that the Services "insure" an absence of jeopardy or harm to habitat.

Defendants argue that their approach to mitigation measures merely puts such measures on equal footing with the rest of a project proposal.  In the notice of the final rule in 2018, they explained that they had "eliminate[d] a double standard such that all aspects of the proposed action are treated the same by assuming the action will be implemented as proposed in its entirety" and that minimization measures should "not be forced to meet a heightened threshold" compared to harmful effects.  84 Fed. Reg. at 45007.  The Services' explanation, however reasonable or unreasonable, does not allow them to evade contrary Ninth Circuit precedent.

For these reasons, the Court agrees with Plaintiffs that an agency does not satisfy its obligation under Section 7 to insure against harm to species or habitat by resting its conclusions on "plans" that are merely proposed and non-binding.  The Court concludes that the regulations contradict the text of the ESA in requiring mitigation measures to be treated like any other part of the project proposal and not to "require any additional demonstration of binding plans."  50 C.F.R. § 402.14(g)(8) (2025).  This portion of the regulations is invalid.

### 3.    § 7: Definition of "Destruction or Adverse Modification"

Under Section 7, the action agency and the responsible Service consult to "insure" that the agency action will not cause "jeopardy" to listed species or "destruction or adverse modification" to their critical habitats.  16 U.S.C. § 1536(a)(2).  The ESA regulations define "destruction or adverse modification."  50 C.F.R. § 402.02.  Before 2019, the regulations defined "destruction or adverse modification" to "mean[] a direct or indirect alteration that appreciably diminishes the

26

value of critical habitat for the conservation of a listed species." 50 C.F.R. § 402.02 (2018). In 2019, the definition was amended to "a direct or indirect alteration that appreciably diminishes the value of critical habitat *as a whole* for the conservation of a listed species." 50 C.F.R. § 402.02 (2019) (emphasis added). That definition remains in effect.

Plaintiffs argue that the Services erred in introducing the narrowing language "as a whole." They also argue that the Services erred in failing to define "destruction" and "adverse modification" separately. The Court finds that requirement that the value of habitat be appreciably diminished "as a whole" inappropriately narrows the scope of the statutory protection. The Court also finds, however, that "destruction" and "adverse modification" need not be defined separately.

a.    **"As a Whole"**

Plaintiffs argue that the Services "flout[] the plain terms of the statute" in limiting "adverse modification" to that which "appreciably diminishes the value of critical habitat *as a whole*" where the statute contains no such limitation. ECF No. 37 at 29. They argue that this language "replaces a categorical statutory prohibition with a regulatory provision that vastly increases the allowable impact to critical habitat." *Id*. The Court agrees. The challenged language authorizes piecemeal diminution of critical habitat, which, by definition, has already been deemed "essential." 16 U.S.C. § 1532(5)(A). The statutory text, by contrast, prohibits adverse modification entirely. *See* 16 U.S.C. § 1536(a)(2).

In the 2019 notice of final rulemaking, the Services state that a proposed action's adverse effects will be found to result in "destruction or adverse modification" only if the effects "will diminish the conservation value of the critical habitat in such a considerable way that *the overall value of the entire critical habitat designation to the conservation of the species is appreciably diminished*." 84 Fed. Reg. at 44986 (emphasis added). "It is only when adverse effects from a proposed action rise to this considerable level that the ultimate conclusion of 'destruction or adverse modification' of critical habitat can be reached." *Id*. This explanation acknowledges that the "as a whole" modifier imposes a significant restriction on the statutory language of the ESA, which by its text applies to any adverse modification, with no requirement that the adverse modification rise to a "considerable level."

27

United States District Court
Northern District of California

Plaintiffs identify several ways that the challenged "as a whole" modifier undermines the purpose of the statute.  They argue that "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, . . . pose a significant risk to a species."  ECF No. 37 at 30 (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1075 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004), *superseded on other grounds by* Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016)).  They also assert that "species often require multiple populations dispersed across different locations to achieve stability and resilience" and "relatively small areas within a larger critical habitat designation" are sometimes "necessary for specific life functions such as breeding, nesting, or foraging."  *Id.*  They suggest that "[t]he threat of piecemeal destruction of habitat especially affects highly migratory or wide-ranging species, which require large amounts of designated critical habitat, sometimes in contiguous units."  *Id.*  Plaintiffs argue that the Services' "as a whole" regulatory definition threatens a "slow slide into oblivion," by allowing piecemeal destruction or adverse modification which is "one of the very ills the ESA seeks to prevent."  *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

These arguments are persuasive and the Ninth Circuit's decision in *Butte Environmental Council v. U.S. Army Corps of Engineers*, 620 F.3d 936 (9th Cir. 2010), does not compel a contrary conclusion.  *See* ECF No. 43 at 46.  That case, which did not address the statutory construction questions at issue here, merely observed that not every instance of destruction of habitat rises to the level of adverse modification.  620 F.3d at 948.  In fact, the Court explicitly recognized that where evidence in the record showed that "some localized risk was improperly hidden by use of large scale analysis," it may be appropriate to second-guess the Services' no-adverse-modification finding.  *Id.*  The use of "large-scale analysis" to obscure local effects is exactly what the "as a whole" language enables, and what Plaintiffs condemn here.

Furthermore, under the statute, the Services only designate habitat "after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  The fact that the scope of the critical habitat is already limited by such pragmatic concerns supports Plaintiffs' position that the prohibition on adverse modification is absolute, rather than limited to modifications affecting the habitat "as a whole."

28

Defendants analyze the text of the Section 7 consultation requirement, which requires agencies to insure that their actions will not "jeopardize the continued existence of" listed species or cause "the destruction of adverse modification of" critical habitat.  16 U.S.C. § 1536(a)(2). Because the jeopardy determination references "species" and not individual members of those species, Defendants argue that "adverse modification" must correspond to the whole habitat, rather than pieces of it.  ECF No. 43 at 44.  Whatever superficial appeal this argument might have, it is undercut by the plain meaning of "adverse modification":  nothing about the term "adverse modification" requires that impact to be especially large.  An adverse modification to a small part of a species' habitat *is* an adverse modification to the habitat as a whole.  In other words, even if adverse impacts are analyzed at the level of the habitat as a whole, impacts too small to constitute "appreciable diminishment of the overall value of the habitat as a whole" would still count as adverse modification of the habitat as a whole.  Defendants' theory does not save the "as a whole" modifier, which impermissibly limits the scope of the Section 7 prohibition on adverse modification of critical habitat.

The Court finds that use of the modifier "as a whole" contradicts the statute because it allows "adverse modification" to critical habitat as long as the modification does not "appreciably diminish[] the overall value" of the habitat.  50 C.F.R. § 402.02.

### b.    Failure to Define Separately

Plaintiffs argue that the Services erred in failing to define "destruction" and "adverse modification" separately.  ECF No. 37 at 32.  They argue that separate definitions are required because the statute describes "destruction or adverse modification" and the word "or" disjunctively connects two terms with distinct meanings.  *Id*. (citing *United States v. Woods*, 571 U.S. 31, 45–46 (2013)).  They argue that in failing to define destruction and adverse modification separately, "the Services failed to give them separate meanings, rendering language in the ESA meaningless and disregarding the underlying Congressional intent."  *Id*. at 33.

Plaintiffs' position is that "'[d]estruction' refers to an action that completely and permanently eliminates critical habitat for a species—such as the paving over of habitat to build a parking lot."  *Id*.  "Adverse modification," in Plaintiffs' view, "refers to an action that impairs the

29

value of critical habitat for the species' survival or recovery but not in a manner that necessarily precludes that habitat from ever having conservation value—such as logging that removes important habitat components until trees grow back." *Id.*

The Court is not persuaded by this argument. It is true that "destruction" connotes a more complete or permanent harm than "adverse modification." Certainly, the terms can seem mutually exclusive: something that is only adversely modified has not been destroyed, and something that is destroyed cannot be said to have been merely adversely modified. However, the regulatory definition clearly encapsulates both terms in defining them broadly as "a direct or indirect alteration that appreciably diminishes" the conservation value of the habitat. 50 C.F.R. § 402.02. As Defendants argue, a permanent or extreme alteration might be considered a "destruction" while a temporary or minor alteration might be considered an "adverse modification." ECF No. 43 at 48.

The Court also notes that the Services have defined these terms jointly since at least 1986. *See* 51 Fed. Reg. 19926, 19958 ("'Destruction or adverse modification' means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.").

For these reasons, the Court finds that the Services' definition reflects a permissible reading of the statute.

**4.    § 7: Duty to Request Reinitiation of Consultation**

Before the 2024 rulemaking, the Section 7 regulations required the action agency or the responsible Service to request reinitiation of consultation when (1) the degree of "taking" of a listed species exceeded that projected, (2) new information revealed effects not previously considered, (3) changes to the action caused effects not previously considered, or (4) newly listed species might be affected by the action. 50 C.F.R. § 402.16(a) (2023). The 2024 rulemaking struck the reference to the Services, so that only the action agency is required to request reinitiation of consultation. *See* 50 C.F.R. § 402.16(a) (2025); 89 Fed. Reg. at 24279–80.

United States District Court
Northern District of California

30

Plaintiffs argue that the Services unlawfully renounced their duty to request reinitiation of consultation, which served as an important check on action agencies failing to act on a re-consultation obligation with which they have less familiarity.  ECF No. 37 at 34.

Plaintiffs identify no statutory source of a duty for the Services to request reinitiation of consultation.  *See id*. at 34–36; 16 U.S.C. § 1536(b)(4) (defining the Services' obligations after consultation).  Therefore, they must show that the Services failed to give adequate reasons to support amending the regulations to remove their duty to request reconsultation.  Plaintiffs have met this burden.

In the 2024 rulemaking, the Services provided two reasons for striking their obligation to request reinitiation.  First, the Services intended to resolve confusion concerning the scope of their authority because "only the Federal action agency has the authority and responsibility to initiate or reinitiate consultation."  89 Fed. Reg. at 24280; *see also* 88 Fed. Reg. 40753, 40756–57 (June 22, 2023).  That the Services lack the authority to compel the action agency to engage in consultation is uncontested and flows from the text of the statute, which places the onus on the action agency.  *See* 16 U.S.C. § 1536(a)(2) (providing that "[e]ach Federal agency shall, in consultation with . . . [the Services], insure" that the action will not jeopardize listed species); *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987), *overruled on other grounds by Cottonwood Env't L. Ctr.*, 789 F.3d 1075 (holding that the ESA "does not give the FWS the power to order other agencies to comply with its requests").
However, in requiring the Services to request reconsultation, the regulatory text did not in fact state that the Services had the authority to *require* reconsultation.  And to the extent that the regulations plausibly implied that the Services had the authority to require action agencies to undergo reconsultation, that would be a reason for the Services to clarify that their duty to request reconsultation carries no corresponding authority to require reconsultation—not a reason to do away with the duty to request reconsultation entirely.  The Court agrees with Plaintiffs that the Services' first rationale is incomplete in  "arbitrarily sidestep[ing] whether the Services should at least be required to *request* that action agencies reinitiate consultation."  ECF No. 37 at 35.

The Services also explained that the revision is necessary to counteract recent case law

United States District Court
Northern District of California

interpreting the regulations as requiring the Services to reinitiate consultation.  *See* 88 Fed. Reg. at 40756–57.  The notice of proposed rulemaking cites *Ctr. for Biological Diversity v. U.S. Forest Serv.*, which found that the regulations imposed a duty on the Services to reinitiate consultation and collected cases from Ninth Circuit courts holding the same.  No. 20-00020, 2020 WL 6710944, at *4 (D. Ariz. Nov. 16, 2020).  This reasoning is circular.  *Center for Biological Diversity* and the cases it cites held that the regulations required the Services to request reconsultation because the regulations *did* require the Services to request reconsultation.  The Services needed to explain the rationale for removing that requirement.  The Services ignore, moreover, that their obligation to request reconsultation long predates the caselaw they cite.  *See* 51 Fed. Reg. at 19926 (June 3, 1986) ("In response to one comment, the Service notes its lack of authority to require Federal agencies to reinitiate consultation if they choose not to do so.  Nevertheless, the Service shall request reinitiation when it believes that any condition described in this section applies.").

The gravamen of Defendants' argument is that they deleted  their duty to request reinitiation of consultation because the statute does not impose that duty.  But notwithstanding the absence of a statutory duty, the Services had imposed one by regulation for more than 25 years.  Because they did not explain the decision to do away with that regulatory duty, the decision to do so was arbitrary and capricious.

### 5.    § 4: Foreseeable Threats

The ESA defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

Before 2024, the Section 4 regulations governing the listing of threatened species required the Services to analyze "whether the species is likely to become an endangered species within the foreseeable future."  50 C.F.R. § 424.11(d) (2023).  It defined foreseeable future to "extend[] only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely."  *Id*.  The 2024 rulemaking modified this language slightly, defining the foreseeable future to extend "as far into the future as the Services can make

reasonably reliable predictions about the threats to the species and the species' responses to those threats."  50 C.F.R. § 424.11(d) (2025).  The Services therefore exchanged language requiring the Services to "reasonably determine" that threats and ensuing population harm are "likely" for language requiring the Services to make "reasonably reliable predictions" about those same outcomes.

Plaintiffs argue that the new language contradicts the "best available evidence" rule and undercuts the forward-looking, preventative aims of the statute.  ECF No. 37 at 37–38.  The Court is not persuaded.

As a preliminary matter, the Court does not find that the 2024 standard is more stringent than the prior standard.  In fact, the two phrasings appear synonymous.  Logically, to "determine" that an effect is "likely," one must make a "reliable prediction" about that effect; if the prediction is not reliable, it would be hard to conclude that the forecast outcome is likely.  Notably, Plaintiffs do not address the similarity between the two sets of rules or attempt to explain why the newer standard is more stringent.

In publishing the final 2024 rules, the Services explained that they crafted the amended definition of "foreseeable future" to match an M-Opinion issued by the Solicitor of the Department of the Interior in 2009.  89 Fed. Reg. at 24307, 24308–09.  They also explained that "'[r]eliable' does not mean certain; it means sufficient to provide a reasonable degree of confidence in the prediction, in light of the conservation purposes of the Act."  *Id*. at 24302–03.

Plaintiffs also argue that the "reasonably reliable prediction" rule violates the "best available evidence" standard, discussed in Section IV.B.1 of this order.  The Court disagrees for two reasons.  First, as the Court has already concluded, a "reasonably reliable prediction" does not appear to require more certainty than a "determination of likelihood," and it is the statute itself which requires a finding of likelihood before a species can be listed as threatened.  16 U.S.C. § 1532(20).  Second, the regulations' "reasonably reliable prediction" standard does not exclude *consideration of* evidence.  In the Section 7 context discussed above, the regulation's limitation on "effects of the action" prevented the Services from considering certain effects at all in making the jeopardy determination, unless those effects were "reasonably certain to occur."  Here, the

33

regulations do not prohibit the Services from considering any evidence, but merely dictate whether or not, after considering all of the relevant evidence, threats are sufficiently likely to warrant species listing as threatened.[13]

### 6.     § 4: Concurrent Designation of Critical Habitat

Section 4 of the ESA requires the Services to designate critical habitat concurrently with species listing "to the maximum extent prudent and determinable."  16 U.S.C. § 1533(a)(3), (b)(2), (b)(6)(C).  The statute defines "critical habitat" for a threatened or endangered species to mean "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" or "specific areas outside the geographical area occupied by the species . . . upon a determination by the [Services] that such areas are essential for the conservation of the species."  *Id*. § 1532(5)(A).

From 2016 to 2019, the implementing regulations provided that "designation of critical habitat is not prudent when . . . (i) The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species; or (ii) Such designation of critical habitat would not be beneficial to the species."  50 C.F.R. § 424.12(a)(1) (2018).  In 2019, the Services added the following language to condition (ii): "In determining whether a designation would not be beneficial, the factors the Services may consider include but are not limited to: Whether the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or whether any areas meet

---

[13] Plaintiffs also complain that the "reasonably reliable prediction" requirement must be satisfied as to *both* the threat to a species and the species's response to that threat.  *See* ECF No. 37 at 38; ECF No. 54 at 35.  The Court does not see how the Services could reasonably find that a species is "threatened" without making some determination regarding how a given threat will affect that species.  They cite *Jewell*, which they characterize as vacating FWS's determination that the wolverine did not warrant listing as a threatened species even though "[t]he biological response of wolverine populations" to loss of deep snow habitat could not "reasonably be deduced with an acceptable degree of certainty."  176 F. Supp. 3d at 996.  But that case detailed the scientific evidence showing wolverine's snow-adapted traits and the robust scientific consensus that wolverines could not reproduce without snow to create natal dens.  *Id*. at 979.  In other words, the parties and the Court could determine exactly how wolverines would respond to snow loss—by losing their ability to reproduce—but were merely unable to pinpoint with exactitude the explanation for that response, which might include loss of thermal protection, predator shielding, or food caching.  *Id*.

the definition of 'critical habitat.'"  50 C.F.R. § 424.12(a)(1) (2019).  In 2024, the Services amended the regulations again to provide that "[d]esignation of critical habitat may not be prudent in circumstances such as, but not limited to . . . (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species; (ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species; (iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States; or (iv) No areas meet the definition of critical habitat."  50 C.F.R. § 424.12(a)(1) (2024).

Plaintiffs argue that the new language substantially expands the conditions under which the Services may find designation of critical habitat to be not prudent because such conditions are "not limited to" those enumerated.  ECF No. 37 at 42.  They further argue that conditions (ii) and (iii) impermissibly expand the Services' authority by allowing them to find that habitat designation is not prudent even where designation would benefit listed species.  *Id*.

The ESA's legislative history contains commentary suggesting that the "not prudent" exception is strictly limited to "rare circumstances where the specification of critical habitat . . . would not be beneficial to the species."  H.R. Rep. No. 95-1625, at 17 (1978), 1978 WL 8486.  Reading this legislative history, the Ninth Circuit holds that "Congress intended the imprudence exception to be a narrow one" and has rejected attempts to weaken the requirement that a not-prudent finding benefit the whole species.  *NRDC v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997) (rejecting the Services' attempt to "rewrit[e] its 'beneficial to the species' test for prudence into a 'beneficial to *most of* the species' requirement" as "inconsistent with clear congressional intent").

The Services counter that their changes do not weaken the statutory requirement that habitat be designated concurrently unless doing so would not benefit listed species.  They explain that the 2019 changes merely "identified the most likely scenarios for considering whether a determination might not be prudent," ECF No. 43 at 56, while the 2024 changes addressed feedback that the factors added in 2019 were "difficult to understand and apply," 83 Fed. Reg. at 35197; 89 Fed. Reg. at 24318.  The Services explained that they preferred to base "not-prudent

United States District Court
Northern District of California

determinations on whether particular circumstances are present, rather than on whether a designation would not be 'beneficial'" because their new interpretation is "clearer, more transparent, and more straightforward." *Id.*; 89 Fed. Reg. at 24318; 83 Fed. Reg. at 35197; 84 Fed. Reg. at 45040.

Defendants also disagree with Plaintiffs that finding the designation of habitat not to be prudent requires finding that such designation would not benefit species, reasoning that the statute contains no such language and "legislative history is not the law." ECF No. 43 at 55 (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019)). This Court need not resolve the dispute over the relationship between "prudence" and "benefit" because nothing about the new regulations is facially inconsistent with the prioritization of benefit to the species. The Court takes each of Plaintiffs' three arguments in turn.

First, the Court disagrees that the "not limited to" language violates the statute on its face. Plaintiffs have not alleged or proven that the enumerated conditions are the *only* ones that could establish that concurrent designation of habitat is not prudent within the meaning of the statute. The "not limited to" language cannot be facially invalid without a showing that the enumerated conditions exclusively encapsulate all possible permissible conditions, which Plaintiffs have not made. If the Services seek to use the "not limited to" language to introduce justifications for a not-prudent finding other than those enumerated, they will remain constrained by the overall meaning of the regulations and the text of the statute.

As to Plaintiffs' challenges to conditions (ii) and (iii), the Court finds that neither violates the statute on its face.

Condition (ii) allows the Services to make a not-prudent finding where habitat loss is not a threat to the species. The Ninth Circuit holds that critical habitat serves not only to stave off threats to a species' survival, but also to "carve out territory that is . . . essential for the species' recovery." *Gifford Pinchot*, 378 F.3d at 1070. Plaintiffs therefore argue that the "no-threat" condition allows the Services to fail to designate critical habitat needed to preserve species' ability to recover from population loss, harming the species in the long term. ECF No. 37 at 42. They argue that condition (iii) also "disregards other recognized conservation benefits of critical habitat designation beyond merely alleviating threats, such as 'through informing management partners of

36

important habitats, stimulating scientific surveys or research, promoting voluntary conservation actions, and raising public awareness of habitats that are essential.'" *Id*. at 42–43 (quoting 89 Fed. Reg. at 24317). By disregarding the conservation benefits of critical habitat beyond any present threat to species, Plaintiffs argue, condition (iii) also conflicts with the definition of critical habitat at 16 U.S.C. § 1532(5)(A).

While the Court is compelled by the Plaintiffs' argument that species not presently threatened by habitat loss may be harmed by the failure to designate habitat because of a diminished capacity for population recovery or through other mechanisms, the regulation is not inconsistent with this theory. Rather, the regulation provides that "[d]esignation of critical habitat may not be prudent in circumstances such as, but not limited to" the absence of threat to the species from habitat loss. 50 C.F.R. § 424.12(a)(1)(ii). It does not *compel* or even necessarily *allow* the Services to reach a not-prudent determination on the sole basis of a no-threat finding. Moreover, the concept of a "threat" that may well encapsulate the more abstract or future threat represented by a species' inability to recover due to lost habitat. Because condition (ii) does not necessarily contradict Plaintiffs' view that not-prudent determinations are only permissible if designating habitat would have no conservation value benefiting the species in the short or long term, the Court will not invalidate it.

As to condition (iii), its text virtually ensures that it does not violate the statute on its face. Condition (iii) allows for not-prudent findings for "[a]reas within the jurisdiction of the United States provid[ing] no more than negligible conservation value . . . for a species occurring primarily outside the jurisdiction of the United States." 50 C.F.R. § 424.12(a)(1)(iii). That this provision is limited to areas with "negligible conservation value" virtually ensures that it does not violate the statute on its face. The failure to designate habitat with negligible conservation value by definition cannot cause anything more than a negligible harm to the species. Where the species is primarily located outside of the United States, it would be especially difficult to connect habitat with negligible conservation value to any harm to listed species. Condition (iii) also does not contradict Plaintiffs' theory of the statute and the Court will not invalidate it.

       7.    **NEPA**

The Services did not analyze under NEPA the environmental impacts of the 2019 or 2024 amendments to the Section 4 regulations.  They determined that they were not required to prepare an environmental impact statement or environmental assessment for the Section 4 regulations because those regulations fell within the Services' respective categorical exclusions for actions that are administrative, financial, legal, technical or procedural in nature.  ESA_S4_AR-0000030; ESA_S4_AR-0000707.  The Services documented their analyses and conclusions in memoranda signed in March 2024.  ESA_S4_AR-0000012-30 (NMFS Categorical Exclusion Memorandum); ESA_S4_AR-0000697-720 (FWS Environmental Action Statement).  The memoranda discussed the proposed changes to the Section 4 regulations from 2019 and 2024, assessed the likely effects of those changes relative to the CEs' provisions, analyzed the applicability of the respective CEs, and considered whether any exceptional circumstances applied.  *Id*.

Plaintiffs argue that use of a CE was not appropriate because the Section 4 changes "substantively weakened the ESA regulatory framework."  ECF No. 37 at 47.  Their primary example of this weakening is that the new regulations allow the Services to find concurrent habitat listing to not be prudent when habitat destruction is "not a threat to the species."  84 Fed. Reg. at 45053; 50 C.F.R. § 424.12(a)(1)(ii).  But the regulations in effect from 2016 to 2019 also contained no-threat language.  NEPA applies to regulatory changes that may impact the environment, but the 2019 and 2024 rulemakings had no environmental impact attributable to the no-threat language because that language predated both rulemakings.  In their reply, Plaintiffs argue that the 2019 rulemaking still had an environmental impact because it elevated the no-threat language from a mere factor to consider to a stand-alone reason for avoiding critical habitat designation.  ECF No. 53 at 39.  But as the Court has already explained, the regulatory text does not necessarily allow the Services to end the analysis at a no-threat determination.  Rather, it merely provides that where there is no threat to the species, designating habitat concurrently *may* not be prudent.

Plaintiffs also argue that the Services disregarded extraordinary circumstances that prohibited them from invoking a CE for the 2019 and 2024 Section 4 Rules.  ECF No. 37 at 48; *see* 40 C.F.R. § 1501.4(b) (2024); 40 C.F.R. § 1508.4 (2019).  They cite two types of

United States District Court
Northern District of California

38

"extraordinary circumstances" under the applicable DOI regulations interpreting NEPA.  First, they argue that the challenged regulations have "readily apparent significant impacts on threatened and endangered species and their critical habitats."  ECF No. 37 at 48; *see* 43 C.F.R. § 46.215(h) (2018).  They also argue that the regulatory change was an extraordinary circumstance because it "[e]stablish[ed] a precedent for future action or represent[ed] a decision in principle about future actions with potentially significant environmental effects."  ECF No. 37 at 48–49; 43 C.F.R. § 46.215(e) (2018).  But Plaintiffs have again not shown how the modest amendments to Section 4 represent extraordinary circumstances such that the Court should disturb the reasoned analysis of the Services on these precise points.  *See* ESA_S4_AR-000025–28 (NMFS); ESA_S4_AR-0000713–17 (FWS); *see Seven Cnty.*, 605 U.S. at 179 (affording agencies' environmental impact determinations under NEPA significant deference).  Because the Court has concluded that the revisions to the Section 4 regulations will not necessarily change the circumstances under which the Services designate a species as threatened or decline to designate critical habitat concurrently, it would be difficult to conclude that the revisions have "significant impacts" on listed species or "establish precedent" for future actions.

### C.    Remedy

The Court has concluded that four of the six challenged regulations violate the text of the ESA or were arbitrary and capricious and are invalid.  *See* 50 C.F.R. § 402.02 (definition of "effects of the action"); *id*. § 402.14(g)(8) (consideration of non-binding mitigation measures); *id*. § 402.02 (definition of "destruction or adverse modification"); *id*. § 402.16(a) (duty to request reinitiation of consultation.  Each of these provisions is readily severable.  *See* 89 Fed. Reg. at 24268–69 (explaining that each regulation "stands on its own" and is intended to operate "independently"); 89 Fed. Reg. at 24301 ("[T]he Services intend that the remaining aspects of the regulatory provisions be severable."); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988).

The Court now considers whether these provisions should be vacated.  When a court finds that challenged regulations are unlawful, the normal remedy is vacatur.  *See Alsea Valley All. v. Dep't of Com.*, 358 F.3d 1181, 1185 (9th Cir. 2004) ("[V]acatur of an unlawful agency rule

normally accompanies a remand."); *Klamath-Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (noting that "courts in the Ninth Circuit decline vacatur only in rare circumstances"); *see also* 5 U.S.C. § 706(2) (providing for a "reviewing court" to "hold unlawful and set aside" unlawful agency action).  Whether an agency action should be vacated depends on how serious the agency's errors are "and the disruptive consequences of an interim change that may itself be changed."  *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993) (citation modified).

Both *Allied Signal* factors counsel in favor of vacatur.  The agency's errors are serious.  Its regulations contradict the text of the Endangered Species Act and undercut the efficacy of Section 7 consultation in protecting threatened or endangered wildlife and marine life.

Vacatur is also unlikely to be disruptive.  The Services state that a new final rule is forthcoming within a year; vacatur here simply allows the relevant pre-2019 provisions to control until that new final rule is promulgated.  The regulations that existed prior to the challenged revisions were in effect for a substantial period of time, such that the Services will be familiar with their provisions and how to apply them.

Defendants also argue that vacatur would be disruptive to the ongoing rulemaking processes, ECF No. 43 at 63, but it is not clear why using a prior version of a rule the Services intend to change is any more burdensome than using the current version.  Defendants argue that vacating the 2024 and 2019 regulations would "create uncertainty on the applicable regulatory regime during the rulemaking process."  ECF No. 43 at 64.  The Court fails to see the lack of certainty.  The applicable regulatory regime is defined by the regulations on the books, as modified by this order.

Courts denying vacatur after reaching the merits tend to do so because the costs of vacatur would be severe.  *See, e.g.*, *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 994 (9th Cir. 2012) (vacatur could deny a region of sufficient power, resulting in blackouts and the use of diesel generators that pollute the air and undercut the plaintiffs' underlying goals); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (leaving an unlawful Section 4 listing in place because delisting the animal could cause its extinction); *Fertilizer Inst. v.*

40

*U.S. E.P.A.*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (leaving unlawful regulations in place because removing them "may affect the EPA's ability to respond adequately to serious safety hazards"). Here, Defendants have not identified *any* costs or other equitable reasons for leaving the unlawful regulations in place. The Court concludes that vacatur is the appropriate remedy.

<strong>CONCLUSION</strong>

Summary judgment is granted in part and denied in part to Plaintiffs and granted in part and denied in part to Defendants, as set forth in this order. The Court vacates the definitions of "effects of the action" and "destruction or adverse modification," 50 C.F.R. § 402.02, and reinstates the versions in effect before the problematic revisions were made in 2019. The Court likewise vacates 50 C.F.R. § 402.14(g)(8), concerning the Services' consideration of mitigation measures, and reinstates the version in effect before the 2019 rulemaking. Finally, the Court vacates 50 C.F.R. § 402.16(a), concerning the duty to request reinitiation of consultation, reinstating the version in effect prior to 2024. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: March 30, 2026



JON S. TIGAR
United States District Judge

United States District Court<br>Northern District of California